ALTGELT et al. v. CALLAGHAN.

(Court of Civil Appeals of Texas. San Antonio. Jan. 31, 1912. On Motion for Rehearing, March 6, 1912.)

1. COURTS (§ 99*) — PREVIOUS DECISION AS LAW OF CASE—PLEADINGS.

Where the court struck out allegations in the petition with the privilege of amending, a trial amendment repeating the allegations stricken out was properly stricken out.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 340; Dec. Dig. § 99.*]

2. ELECTIONS (§ 227*)—CONTESTS—GROUNDS.

A failure of election officers to perform their duties under the election laws will not disfranchise honest voters desiring to vote, unless the law has explicitly declared that the failure shall have such effect.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 197-200; Dec. Dig. § 227.*]

3. EVIDENCE (§ 83*) — PRESUMPTIONS — PERFORMANCE OF OFFICIAL DUTY.

The court, in the absence of a contrary showing, will presume that Election Law 1905 (Acts 29th Leg. [1st Ex. Sess.] c. 11) § 78, prohibiting the counting of ballots not bearing the signature of election officers, or not numbered, was complied with.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 105; Dec. Dig. § 83.*]

4. ELECTIONS (§ 193*)—BALLOTS—FAILURE TO COMPLY WITH STATUTES—EFFECT.

The failure to comply with the election law of 1905 (Acts 29th Leg. [1st Ex. Sess.] c. 11) § 53, as to the printing of ballots, does not render ballots invalid, and votes cast are properly counted.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 165; Dec. Dig. § 193.*]

5. ELECTIONS (§ 166*)—BALLOTS—FAILURE TO COMPLY WITH STATUTES—EFFECT.

The election law of 1905 (Acts 29th Leg. [1st Ex. Sess.] c. 11) §§ 53, 54, providing that the words "for" and "against" shall be printed on each ballot submitting a proposition, but that the form in which the proposition shall be voted on shall be prescribed by the local authorities submitting it, and Act Aug. 19, 1910 (Acts 31st Leg. [3d Ex. Sess.] c. 6), providing for an election in a city on a new charter, and declaring that the order of the council shall direct the printing of the ballots which shall read "for the new charter" and "against the new charter," do not prohibit separate ballots containing the words "for the new charter" and "against the new charter," so that the use of separate ballots will not invalidate the election.

[Ed. Note.—For other cases, see Elections, Dec. Dig. § 166.*]

6. ELECTIONS (§ 166*)—BALLOTS—FAILURE TO COMPLY WITH STATUTES—EFFECT.

A failure to comply with the election law of 1905 (Acts 29th Leg. [1st Ex. Sess.] c. 11) § 46, prohibiting the use of any ballot except the official ballot containing the words "Official Ballot" does not invalidate an election.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 140; Dec. Dig. § 166.*]

7. ELECTIONS (§ 289*)—CONTESTS—CHALLENGES OF VOTERS — FAILURE TO COMPLY WITH STATUTES—PLEADINGS.

An allegation in a petition in an election contest that the election officers in certain precincts refused to entertain challenges of voters is too general to admit proof of a violation of the election law of 1905 (Acts 29th Leg. [1st Ex. Sess.] c. 11) § 73, relating to challenges.

[Ed. Note.—For other cases, see Elections, Dec. Dig. § 289.*]

8. ELECTIONS (§ 227*)—VOTING BOOTHS.

A failure of election officers to require voters to prepare their ballots in a voting booth, as required by law, does not invalidate the votes of those not using the booths.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 197-200; Dec. Dig. § 227.*]

9. ELECTIONS (§ 285*)—VIOLATIONS OF ELECTION LAW—PLEADINGS—SUFFICIENCY.

An allegation in a petition to contest an election that the election officers permitted various violations of law as to preparing ballots and voting is insufficient in the absence of averments that the voters, who were assisted in preparing the ballots, were not physically disabled and unable to prepare their ballots.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 266-277; Dec. Dig. § 285.*]

10. APPEAL AND ERROR (§ 1040*)—HARMLESS ERROR—ERRONEOUS RULINGS ON PLEADING.

The error, if any, in sustaining exceptions to allegations in a petition is not prejudicial, where proof, admissible under the allegations, was admissible under allegations remaining in the petition.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4089-4105; Dec. Dig. § 1040.*]

11. ELECTIONS (§ 298*)—QUESTIONS REVIEWABLE—IMMATERIAL QUESTIONS.

Where in an election contest the result was not affected by the votes of retired soldiers and cripples, the court in an election contest would not determine the qualifications of such persons to vote.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 303-305; Dec. Dig. § 298.*]

12. ELECTIONS (§ 305*)—CONTEST—HARMLESS ERROR—ERRONEOUS RULINGS ON MOTIONS.

The error, if any, in denying an order in an election contest for the delivery into court of the ballot boxes pending the action is harmless where the court subsequently granted the motion and there was nothing to show that the ballot boxes had been tampered with.

[Ed. Note.—For other cases, see Elections, Dec. Dig. § 305.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

**13. APPEAL AND ERROR (§ 742*)—QUESTIONS REVIEWABLE—ASSIGNMENT OF ERROR.**

An assignment of error complaining of the striking out of a supplemental petition, not followed by a statement showing the contents of the petition, need not be considered on appeal.

[Ed. Note—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

**14. ELECTIONS (§ 285*)—CONTESTS—RECOUNTING OF BALLOTS—PLEADINGS.**

A petition in an election contest alleging, generally, fraud in the conduct of the election, is insufficient to require the court to recount the ballots cast.

[Ed. Note.—For other cases, see Elections, Dec. Dig. § 285.*]

**15. ELECTIONS (§ 307*)—CONTESTS—COSTS.**

Under Rev. St. 1895, art. 1425, authorizing the successful party to recover of the defeated party costs incurred, and articles 1804j, 1804t, 1804u, providing that costs in election contest cases shall be taxed according to the law governing civil cases, citizens of a city instituting a contest of an election on the adoption of a new charter are, when unsuccessful, liable for the legal costs, but, where they allege fraud in accumulating the costs, the court must determine the facts and relieve them from costs fraudulently incurred.

[Ed. Note.—For other cases, see Elections, Dec. Dig. § 307.*]

On Motion for Rehearing.

**16. COSTS (§ 184*)—WITNESS FEES—PARTIES ENTITLED TO COSTS.**

Parties to an action or those vitally interested in the decision of the case may not charge for their attendance on the trial.

[Ed. Note.—For other cases, see Costs, Cent. Dig. §§ 724, 725; Dec. Dig. § 184.*]

**17. WITNESSES (§ 25*)—ELECTION—CONTESTS—COSTS—WITNESS FEES.**

A person whose vote is contested in an election contest, instituted by contestants who have no pecuniary interest in the case, but acting merely as the representative of a large body of the voters of the community, is not entitled to fees for attending the trial.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 50, 53, 54; Dec. Dig. § 25.*]

**18. CLERKS OF COURTS (§ 14*)—FEES—SUBPŒNAS.**

The insertion of a name in a subpœna, within a statute giving the district clerk a fee for each subpœna and for each additional name inserted therein, is the insertion of a name in a subpœna after it has been signed and verified by the clerk, but the insertion must be made by the clerk or his deputy, and names inserted by others are illegally inserted and fees are not recoverable therefor.

[Ed. Note.—For other cases, see Clerks of Courts, Cent. Dig. § 42; Dec. Dig. § 14.*]

Appeal from District Court, Bexar County; Arthur W. Seeligson, Judge.

Election contest by E. J. Altgelt and others against Bryan Callaghan. From a judgment for contestee, contestants appeal. Affirmed in part; reversed and remanded in part.

Wm. Aubrey, Geo. R. Gillette, C. C. Cresson, J. Ira Kercheville, Selig Deutschman, F. H. Booth, and Clinton G. Brown, for appellants. Houston, Boyle, Storey & Davis, for appellee.

FLY, J. This is an action to contest an election held in the city of San Antonio, Tex., by virtue of an act of the Legislature approved by the Governor of Texas, on August 19, 1910 (Acts 31st Leg. [3d Ex. Sess.] c. 6), to determine whether the charter set forth in the legislative enactment should be adopted by the people, which was instituted by E. J. Altgelt and 49 other duly qualified voters, citizens, residents, and taxpayers of said city, against Bryan Callaghan as mayor of the city of San Antonio, who it was alleged had been a resident in and mayor of the city for more than six months, and a member of the city council which examines the returns and announces the results of all elections held in the city. It was alleged that the election was held on February 4, 1911, and the returns as announced by the council showed that 7,070 votes were cast for the new charter, and 7,250 were cast against it. that divers illegal votes were embraced in the count sufficient in number to have changed the result of the election, and the names of the disqualified voters, the precincts where they voted, and the causes of their disqualification were set forth in a schedule attached to the pleading. It was further alleged that at and before the election the mayor and council were members of a political organization or party opposed to the new charter; that under the legislative enactment providing for the election and other laws of Texas the election should have been held in conformity with the law known as the "Terrell Election Law," but was held in violation of that law and of the provisions of article 6, sections 4 and 5, Constitution of the state of Texas, which direct that all elections by the people shall be by ballot and that voters, except in cases of treason, felony, and breach of the peace, shall be privileged from arrest while attending elections and going to and returning from the polls, by reason of the fact that the ballots provided by the council for the election did not consist of one piece of paper on which were printed "For the New Charter," and "Against the New Charter," but consisted of two separate pieces of paper on one of which was printed "For the New Charter," and on the other "Against the New Charter;" that the ballots were not stamped official, nor were they printed on paper of uniform style and of sufficient thickness that marks could not be seen through them; that the presiding judges in the precincts did not write their signatures on the blank sides of the ballots, which were not numbered or marked "voted" when they were voted; that the officers of the election in certain precincts refused to entertain challenges of voters and permitted various violations of law in regard to preparing ballots and voting; that a large number of special policemen were appointed for election purposes, who arrested citizens and intimidated voters, and prevented large numbers from voting; that the ballots cast were not fairly counted,

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

tallied, and returned, and were returned as showing 7,230 votes against the charter when the votes did not exceed 6,830, and returned the votes for the charter as 7,070, when in truth and fact more than 7,470 qualified votes were cast for the new charter. Appellants prayed that the returns from certain precincts be thrown out and quashed, that a recount take place, and that the ballot boxes containing the votes be brought into court and placed in possession of the clerk.

Appellee filed a general demurrer and 13 special exceptions, a general denial, and specially set up countercharges of misconduct on the part of appellants and members of their organization, and specifically denied all the charges, accusations, and complaints made against the city council, election officers, and police force, and alleged that many legal voters who desired to vote against the charter were prevented from so doing by threats "of the emissaries, agents, and boosters of the commission government league and by the contestants, or some of them, and by other members of said organization." The answer was met by a paper denominated "reply of contestants to reply of contestee," and this was followed by "contestants' supplemental statement or petition," contestants' trial amendment, and several more supplemental petitions amounting in all to eight, and "contestees' first supplemental answer." The court sustained exceptions to sections 6 and 7 in the original petition, then permitted a trial amendment to be filed containing practically the same allegations that were contained in the rejected sections, and then again sustained the exceptions to them. A jury was demanded by appellee, but was denied by the court, and after a trial of about twelve weeks, and the examination of about 1,100 witnesses, the court found that 151 votes which were returned as cast against the charter were illegal, which being deducted from the total vote of 7,230 returned as against the charter left 7,079 legal votes cast against the charter; that the official returns showed 7,070 votes for the charter to which was added one vote not allowed to be cast, and from which was subtracted 57 illegal votes, as total legal votes leaves 7,014, giving a majority of 65 against the charter. The court found that the retired soldiers, whose names were given, were legal voters, and that four crippled persons were legal voters. He also found that eight votes, the names of the voters being given, were alleged to be illegal by appellants and admitted to be such by the appellee, but no testimony was introduced in regard to them and they were held to be legal voters and cast their ballots for the charter.

The following conclusions of fact and law were also found by the trial judge:

"1. I find that on February 4, 1911, under and by virtue of an act of the 31st Legislature of the state of Texas, chapter 6, approved August 19, 1910, an election was held in the city of San Antonio, Bexar county, Tex., by the people of said city to determine if the new charter provided in said legislative act should be adopted.

"2. I find that the contestants in this suit, and each of them, were at the date of the institution of this suit and at the time of the trial and on February 4, 1911, duly qualified voters, citizens, residents, and taxpayers of the said city.

"3. I find that the contestee was at the time of the trial and at the date this suit was filed, and had been for more than six months before the filing of the petition here, a resident of said city, the duly elected, qualified, and acting mayor thereof, and a member of the city council of said city, whose duty it was to examine, and which in fact examined, the returns and announced the result of the said election.

"4. I find that the following named persons alleged in contestants' pleadings voted at said election, that Geo. T. Tabler, Pat Malory, Henry A. Rappold, Geo. Lough, Robert A. Brown, Henry Dietrich, James Kennedy, E. Moraity, Jno. McMahon, Jos. Starace, Fred Weber, and Sandy Fay voted against the new charter; that John H. Grubb, Sol Black, B. Mulhern, Herman Guenther, Chas. Leonard, Wm. Ritzens, Josia J. Veach, Conrad Westworth, John Faulds, and Jno. Stewart voted for the new charter, and that all the above-named voters were on the date of said election enlisted men of the army of the United States on the retired list:

"5. I find that Crespin Gomez, Rodrijo Hinejosa, Penteleon Gonzales, and Doreteo Perez voted at said election; that the first one named voted for the new charter; that the last three named voted against the new charter; that said persons were at the date of said election 54, 47, 55, and 43 years old, respectively, that they had lost a foot, a foot, a hand, and a foot, respectively, before they had received their exemption certificates; that they were all residing in the state of Texas prior to and on January 1, 1910; that neither one of them had paid his poll tax levied for the year 1910; but had each received an exemption certificate for said year 1910 on account of having lost a hand or a foot and for that reason only.

"Additional Conclusions of Law.

"1. I conclude that the persons named above in section 4 of these additional findings of fact, who were at the date of said election enlisted men of the army of the United States on the retired list thereof, were legal voters at said election, and I counted their votes in tabulating the returns of said election.

"2. I conclude that the persons named above in section 5 of those additional findings of fact, who had not paid their poll taxes but who had received exemption cer-

tificates on account of having lost a hand or foot, were legal voters at said election, and I counted their said votes in tabulating said returns."

The first, second, third, fourth, fifth, sixth, and seventh assignments of error assail the action of the court in sustaining the exceptions to certain sections of the trial amendment of appellants. It is revealed by the record that on April 8, 1911, exceptions to appellants' original petition were sustained by the court to sections 6 and 7, which set up misconduct of municipal officers, violations of the Terrell election law, the use of two ballots instead of one, failure of the presiding judge to write his name and the number and that it was voted on certain ballots, etc., and appellants were given leave to amend. On April 15th appellants filed their "supplemental statement or petition" and the trial began. On May 4, 1911, appellants filed a trial amendment, with leave of the court, in which the allegations stricken out in the original petition were again pleaded, and on June 26, 1911, the exceptions were again sustained. The trial, which began on April 17th, ended on July 7, 1911, and most of the witnesses had testified before the trial amendment was filed.

[1] The assignments of error do not seek to have this court review the action of the trial court in striking sections 6 and 7 from the original petition, but each of them is based on an order made as to the trial amendment. It was discretionary with the court to give leave to file the trial amendment, and when the same matter was pleaded as had been stricken from the original petition it was not error to strike out the trial amendment. The court had ruled on the same subject and the error was committed, if at all, in the original action of the court and not in the last instance. The court, it is presumed, did not know what the trial amendment would contain, and it was not error, when he discovered that it was practically a refiling of certain parts of the original petition, to strike it from the record. If action of the court could from time to time be invoked in regard to the same subject, the time of the court could be uselessly consumed, trials delayed, and great injustice done. The court had extended to appellants the privilege of amending their pleadings at the time the exceptions were sustained, but, without availing themselves of the privilege, they entered the trial and after nearly three months had elapsed, and supplemental pleadings had been filed by them, and the trial was drawing to a conclusion, the trial amendment, containing the rejected pleadings, was filed, and the court properly refused to consider them. Contreras v. Haynes, 61 Tex. 103. No complaints having been made in this court of the action of the court in sustaining the exceptions to substantially the same allegations as those in the trial amend-

ment, and being of opinion that the court did not err in striking out a repleading of the same matter, the first seven assignments could properly be overruled.

Although not properly before this court for consideration, we have investigated the allegations in the original petition and trial amendment, and conclude that there was no error in the action of the court in sustaining the exceptions to sections 6 and 7. It it be admitted that the words, "for the new charter" and "against the new charter," should have been printed on one piece of paper instead of two pieces as alleged, that the ballots were not ordered by the council and were not stamped official, that they were not of sufficient thickness to prevent marks from being seen through them and were of different sizes, and that voters cast ballots without retiring to the booths before so doing, still none of these matters, nor all of them, would invalidate the election and destroy the ballots so cast.

[2] Election laws are passed to purify and keep pure popular elections, and not to provide pitfalls and snares for voters and prevent the right of suffrage by technicalities which do not go to the fairness of the election. Certain duties are laid upon the officers of election, but a failure to perform those duties should not be permitted to disfranchise the honest voter who desires to register his ballot on questions of state, unless the law has explicitly declared that they shall. The matters of preparation of the ballots, and marking "voted" on them, are duties enjoined upon the officers of election and it was never contemplated by the Legislature that citizens should be disfranchised by the failure of the officers to perform those duties. State v. Phillips, 63 Tex. 393, 51 Am. Rep. 646; Fowler v. State, 68 Tex. 34, 3 S. W. 255; Kulp v. Railey, 99 Tex. 310, 89 S W. 957; Gallagher v. Church, 142 S. W. 671, by this court, not yet officially reported; People v. Wood, 148 N. Y. 145, 42 N. E. 536. A brief review of those cases will not be inappropriate.

In the case of State v. Phillips, the election was sought to be avoided because a large number of the ballots were "diamond shaped," which was alleged to be a device in violation of the election law of 1879. Laws 1879, c. 83. The court held that the ballots were not illegal.

In Fowler v. State, it was said: "The object of every popular election for officers is to ascertain the will of the people as to what persons shall serve them as such in the various positions to be filled. A free, fair, and full expression of the public will is sought, and certain means are prescribed by law as the most certain to bring about the desired result. Some of these, from their very nature, or from the manner in which they are prescribed, are deemed absolutely essential to the accomplishment of the de-

sired result. Among these may be named the requirement that the voting shall be by ballot; that it shall take place on a certain day, and within certain precincts, etc. These are prescribed to insure perfect freedom of choice to the citizen, to serve his convenience in getting to the polls, and to bring out a full vote at the election. Then there are other requirements such as those which have been neglected in this case, that are merely formal in their character. * * * But these requirements are always treated as directory; the law, either expressly or in effect, makes them essential to the validity of the election. Electors must not be deprived of their votes on account of any technical objection to the manner in which the election has been held, or for any misconduct on the part of presiding officers, if these have not affected the true result of the election." In that case the kind of ballot boxes prescribed by law were not used.

In the case of Kulp v. Railey a candidate had not been nominated nor his name placed on the ballot as required by the Terrell election law, and his election was contested on that ground, and the Supreme Court held: "But, while this course of procedure in making nominations is plainly prescribed, there is nowhere in the statute a provision that votes shall be void or shall not be counted because of a departure from the rules laid down in the making of nominations. On the contrary, the general scheme of the act is against such an idea. All questions of that sort are determined for the voter, before the election, by the official ballots. By minute directions and commands addressed to the officers, the law seeks to secure the formation of a ballot which shall show to the voter that the preliminaries have been arranged. Most of these commands can be enforced otherwise than by defeating votes after they have been cast, and many have attached to them the sanction of severe penalties for their violation. In some instances it is expressly provided that votes shall not be counted if certain rules are not observed; but, as we have said, there is nothing to indicate a purpose that questions arising out of the making and certifying nominations shall affect the validity of an official ballot after it has been voted. The voter has nothing to do with the making up of the ballot, but is required to use it, in order to exercise his right to vote. He can only vote for those whose names are printed on it or strike them out and insert others. The ballot comes to him from the officers of the law, regular on its face and authenticated, both by the printing on it and by the signature of the judge of election, as the ballot he is required to use. If it is in the power of the Legislature to thus impose on voters in exercising their constitutional right, the necessity of voting tickets prepared for them in advance, and yet to defeat their choice, not for act or omission of their own, but because of an antecedent dereliction of the officers appointed by law to prepare the ballots, certainly no purpose to do so can be imputed to the Legislature without the clearest expression."

In the case of Gallagher v. Church, this court held that a failure to mark the word "voted" on the ballots did not render them illegal, and the New York case cited fully supports the Texas decisions cited, and the rule announced in them would dispose of every act of misconduct alleged against the officers of election in the rejected section, No. 6, except those in regard to a failure of the presiding judges to place their signatures upon the ballots in certain precincts and number them.

[3] The law requires the presiding judges to perform those duties, and it is provided in section 78 of election law of 1905, page 538, Acts of the 29th Legislature, that the counting judges and clerks "shall count no ballots that do not bear his signature, or are unnumbered," but in no part of the original petition or the trial amendment is there an allegation that such ballots were counted. Without that allegation the trial amendment charged nothing that would attack the validity of the count of the ballots in the election precincts referred to in the amendment. The presumption would prevail that the counting judges and clerks complied with the terms of the law and did not count the ballots that were unnumbered and upon which the signature of the presiding judge had not been written.

[4] Section 53 of the election law of 1905 requires that "all ballots shall be printed with black ink on clear white paper of sufficient thickness to prevent the marks thereon to be seen through the paper and of uniform style," but it is not declared that a failure to so print the tickets shall render them invalid, and, under the authorities herein cited and quoted from, the votes would not be cast out for a failure to comply with the law in that respect.

[5] When an election is held on any question, not involving the election of officers, the law requires that the words "for" and "against" shall be printed on each ballot, but it is also provided: "If a proposition or question is to be voted on by the people of any city, county, or other subdivision of the state, the form in which such proposition shall be voted on shall be prescribed by the local or municipal authority submitting it." Sections 53, 54, Acts of 1905. That would seem to be broad enough to authorize a city council to have separate tickets as it was alleged was done in this instance. In the act of August 19, 1910, providing for the election on the new charter it is provided that the city council of the city of San Antonio should at its first regular meeting in December, 1910, order an election to be held on the first Saturday in February, 1911, for

the submission of the question of the adoption or rejection of the charter, to give notice thereof, and: "The said order of the city council shall also direct the printing of the ballots to be used in such election, and the same shall provide that the ballot of those favoring the adoption of this charter shall read 'For the New Charter' and those opposing the adoption of the new charter shall read, 'Against the New Charter.'" That provision certainly does not inhibit the printing of the character of ballots described in the rejected pleadings, if it does not in terms authorize them.

[6] It is provided in section 46 of act of 1905 that no ballot shall be used in voting at any election except the official ballot, and it requires those who prepare the ballots to place the words "official ballot" at the top of the ballot in large letters, but it is not declared that the omission of that duty will invalidate an election.

[7] Section 73 of the election law provides that, when a voter is objected to by an election judge or a supervisor or challenger, the presiding judge shall examine him on oath touching the points of objection, and the vote shall be received or rejected, as a majority of the judges may direct, but the allegation in the rejected pleadings as to challenges is too general and indefinite to admit proof and the exception to it was properly sustained.

[8] The provision of the law in regard to voting booths is for the purpose of obtaining secrecy of ballot and is peculiarly for the benefit of the voter, and, while the law in regard to voters preparing their ballots in the booths should be enforced, the failure to do so would not invalidate the votes of those not using the booths.

[9] If the election officers were guilty of the illegal acts alleged in the rejected pleadings of the trial amendment, they should have been indicted and punished, but the allegations are not sufficient to withstand a special exception, because it was too indefinite and did not allege that the voters who were assisted in preparing their ballots were not physically disabled and unable to prepare their ballots, or that they could read and speak the English language.

[10] Section 7 of the trial amendment, to which exceptions were sustained, charges the appointment of 375 special policemen who arrested citizens while they were going to and coming from the polls, and, if such allegation be true, it was violative of the rights of American citizens and subversive of popular government, and such high-handed acts should not be excused or palliated, but should and will meet with the condemnation of every fair-minded citizen and lover of liberty and free institutions, but if the allegations were true it could have been shown under the allegations contained in the eighth section of the original petition. The record fails to indicate that appellants offered any testimony to sustain the allegations contained in section 9.

[11] It is prescribed in article 6, fifth subdivision of section 1, state Constitution, "that all soldiers, mariners and seamen, employed in the service of the army or navy of the United States," shall not be allowed to vote in this state, and it is contended that officers and men on the retired list of the army are prohibited by the Constitution from voting. This might be an interesting subject for consideration and discussion, but it would amount to a mere abstraction in this case, for the trial judge found that 10 enlisted men of the United States army voted for the charter and 12 against it, thereby practically nullifying their votes, the majority of two not having any effect in changing the general result. The same can be said in regard to the four crippled persons who voted, one for the charter and two against. The votes of the retired soldiers and cripples did not affect the result of the election.

[12] The tenth assignment of error assails the action of the court in refusing to order the ballot boxes taken from their lawful custodians and delivered into the possession of the clerk of the district court, pending the determination of the suit. The qualification of the bill of exceptions shows that the order was, although at first refused, afterward granted, and the record fails to show that the ballot boxes had been tampered with or appellants injured in any manner by delay in the order of removal of the boxes, and the question is therefore merely an academic one presenting no real issue, and the assignment will be overruled.

[13] The eleventh assignment of error assails the action of the court in striking out the sixth supplemental petition, but is not followed by a statement showing what the contents of the pleading were, and should not be considered. The record shows that the supplemental petition sought to withdraw appellants' charges of disqualification of certain voters, and it is not apparent that appellants were prejudiced by the ruling nor is any such claim made by them.

[14] The twelfth assignment claims error in the court's refusal to have a general recount of the ballots cast at the election being contested. To sustain the assignment would be a ruling that a naked allegation in a general and indefinite way of fraud would compel a district judge to go into ballot boxes and recount thousands of votes. No statement of facts has been filed in this case, and we must presume that the facts were such as to justify the trial judge in refusing a recount of all the ballots. It would not matter that the pleading was perfect in matter and form; if the facts did not authorize and require a recount, it was properly denied by the court. Bare allegation of fraud should not be sufficient to authorize a court in going back of returns, and inspect-

ing ballots, for, if that be the case, no election could not be held, no matter how fairly and honestly conducted, that some dissatisfied voter could not bring about all the turmoil and strife incident to a contest of an election, and cause the ballots to be recounted, fully exposed, and thereby effectually destroying the secrecy of the ballot.

The costs of the lower court were assessed against appellants, and they filed a motion to retax the costs, alleging therein that they had no personal or pecuniary interest or property rights in the suit, and appeared only as representatives of the public; that certain witnesses claimed witness fees who were in contemplation of law parties to the suit because their qualifications as voters had been attacked; that certain witnesses had claimed fees who had not attended the trial; that certain witnesses had been shown to have been illegal voters, and that they should not be paid witness fees; that certain witnesses had been summoned by appellee and held in attendance on the court with no intention of placing them on the stand, and they were not used as witnesses; that appellants should not be compelled to pay witness fees to those witnesses summoned by appellee; that certain ex parte depositions were taken by the appellee and never used, nor even opened, and that they were taken for the sole purpose of having unjust and exorbitant costs taxed against appellants; that certain costs taxed against them had already been paid; that the clerk had charged in excess of legal fees; and that all the subpœnas issued in the case had been prepared by the parties and the additional names of witnesses inserted therein by the parties, and the clerk should not be allowed to charge for such names. The court entered the following order on the motion: "On this 12th day of July, 1911, came on to be heard the motion of the contestants to reform the judgment made and entered in this cause on 7th day of July, 1911, in so far as by said judgment it was decreed that said contestants pay all costs in this cause incurred, and to retax the costs herein, and· said motion being heard and considered by the court, the contestants offered to prove the facts set out in said motion, but it is the opinion of the court that the facts set out in said motion show no sufficient grounds."

[15] It is provided in article 1804j that "the costs in all contested election cases shall be taxed according to the laws governing in civil cases, except when otherwise specially provided, and bond for costs may be required as in civil suits." The general rule in civil cases is that the losing party shall pay the costs of suit. It is true that it is provided that each party to a suit shall be responsible to the officers of the court for the costs incurred by himself, but it is also provided that the successful party to a suit shall recover of his adversary all the costs expended or incurred therein, except where it is or may be otherwise provided by law. Article 1425, Rev. St. 1895. In article 1804t it is provided that any contest of an election for other purposes than the election of officers shall be conducted in the same manner, as far as applicable, as the election of officers as prescribed by law. In article 1804u it is provided that "in no case shall the costs of such contest be adjudged against such contestee, or against the county, city, town, or village which they may represent, nor shall such contestee be required to give any bond upon an appeal." By "such contestee" is meant the county or district attorney, or the mayor of the city, town, or village, or the officer who declared the official result of the election or one of them. That law is one which specially provides a different rule from other cases so far as the contestee is concerned in cases not involving an office, but it does not exempt contestants from the payment of costs, but in article 1804j there is authority for requiring a bond for costs from contestants and that would be utterly unnecessary, if the payment of costs could be escaped because the contestant has no pecuniary interest in the contest, but institutes suit pro bono publico and that right and justice may prevail. It might be the realization of a dream of altruism, to encourage public spirited citizens, "without money and without price," to inaugurate and prosecute suits for the preservation of the purity of the ballot, but at the same time it would open a broad field for harassing suits that would incumber the dockets of the courts, stir up strife and incur great loss to state, county, or municipality. The Legislature, in its wisdom, has seen fit to order it otherwise, and, however much a· citizen may be actuated by high and patriotic motives, he must risk the chance of loss as do other litigants who enter the courts of the country. We are not called upon·to pass upon the wisdom of the enactments as to costs in contested election cases, for it is sufficient that the law exists, but we are not disposed to think that the evils flowing from the law deterring men from contesting elections would not be greater than at least those arising from a free invitation to any citizen to enter and use the courts and their officers without being liable for any of the expenses.

We think, however, that the contestants in a case like the present should not be discriminated against and have a harsher rule applied to them than to other litigants, and that they should be heard on allegations of fraud in accumulating the costs and the unjustness of items of costs taxed against them, and be granted relief, not only for fraud and injustice, but for mistake in taxing the costs. If fees are taxed for witnesses who did not attend upon the trial, appellants should not pay such costs, or it

witnesses were summoned with no purpose to use them, but to increase the costs, appellants should not be compelled to pay such witnesses fees, or if depositions were taken with no view of using them, but to increase the costs, appellants should not be made to pay them, or, if the clerk has charged fees he should not charge, appellants should not pay such costs. The court should not have summarily dismissed the motion to retax, but should have heard the evidence and based the judgment thereon. Parties should not be left at the mercy of adversaries who are not liable for costs, and who can oppress by filing up unjust and exorbitant costs. Their immunity from costs should not be used to overwhelm the adversary with unjust expenses. This is not an accusation against any party to this suit, but is the statement of a broad principle of right and justice.

We have been fully impressed with the great importance of the points involved in this suit, and have given them laborious and serious consideration, and greatly regret that the different matters have not been as fully and satisfactorily briefed by appellee as the vital interests of the case demanded.

It is the order of this court that the judgment of the lower court as to the result of the election be affirmed, but that the portion relating to the costs be reversed, and the cause remanded to be tried on such proper issues arising under the proper allegations of the motion to retax, as herein indicated.

COBBS, J., did not participate in the decision of this case.

### On Motion for Rehearing.

It is insisted in the motion that certain assignments of error were not ruled on in our opinion, and the criticism is well founded. [16, 17] The propositions under the fifteenth and seventeenth assignments are that a voter, whose right to vote in an election is at issue in a contested election suit, has such an interest in the suit that he is not entitled to witness fees for his attendance upon court; and that a person who is alleged and proved to be an illegal voter is not entitled to witness fees for attending the trial of such contested election suit.

It is the established rule in Texas that parties to an action, or those vitally interested in the decision of a case, shall not be permitted to charge for their attendance upon the trial, and in New York and Wisconsin it has been held that persons whose right to vote has been attacked in a contested election case are to such an extent parties to the suit that evidence of their declarations made on election day or thereafter as to how they voted are, as is the rule in England, admissible in evidence. People v. Pease, 27 N. Y. 45, 84 Am. Dec. 242; State v. Olin, 23 Wis. 319. In Illinois the English rule has been modified by a decision that the voter may be considered a party as against the contestant, and that his declarations as to his want of qualification to vote may be shown after proving by other testimony that he voted adversely to the contestant. Beardstown v. Virginia, 81 Ill. 541. In Kansas and Colorado the declarations are rejected and the English rule repudiated. Gilleland v. Schuyler, 9 Kan. 569; People v. Commissioners, 7 Colo. 190, 2 Pac. 912. In the contested case of Cessra v. Meyers, in the Forty-Second Congress, the report of the committee in no uncertain terms condemned the English rule, as applied to American elections, but in the contested case of Bell v. Snyder it was held by the House of Representatives of the Forty-Third Congress that the declaration of a voter as to how he voted or intended to vote is competent testimony on that point. McCrary on Elections, §§ 450–452. While these authorities are cited to show that the weight of authority upholds the English rule, which ascribes to an attacked voter the disabilities of a party to the suit, it is unnecessary to express an opinion as to whether the English rule in its full force should be adopted or the modified doctrine as propounded by the Illinois court, for the effect of both rulings is to place the person, whose vote is being contested, in the attitude of a party to the suit, and being a party he would be interested in the result at least so far as his own vote is concerned and should not be permitted to collect fees for attending the trial. The judgment would directly affect him either in sustaining or setting aside his vote, the right of suffrage being considered one of the most sacred rights held and enjoyed by freemen, and worth immeasurably more than dollars and cents.

Every voter, either for pure and patriotic motives, or for base and corrupt designs, is interested in sustaining his vote whenever it is attacked, and to that extent he is an interested party, and should not be allowed to profit by his attendance on court in order to testify and sustain his vote. This should be the rule in every contested election case where the contestants have absolutely no pecuniary interest in the case, and are acting as the representatives of a large body of the voters of a community, and who have assumed pecuniary obligations in connection with the case in other respects, which the statutes compel them to pay.

Having failed to successfully prosecute their suit, we are of the opinion that, by the terms of the statutes and the provisions of their cost bond, appellants are liable for all legal costs incurred by officers in performing duties enjoined upon them by statute. They cannot be held responsible for any acts of fraud or oppression on the part of the contestee, unless it should appear

that they had joined in the fraud, and they should be paid for such labor by the unsuccessful party. We include in the services mentioned, not only those of the sheriff and clerk, but also the legitimate, statutory costs of notaries public, or other officers who may have taken depositions of witnesses in obedience to the demands of either party. We say this to correct the impression, which may have arisen from our former opinion, as to the depositions of the witnesses.

[18] The law gives the district clerk 25 cents for each subpœna issued, and 15 cents for "each additional name inserted in subpœna." No one but the district clerk or his deputy has the authority to issue a subpœna from the district court, and no one but the clerk or his deputy would have the authority to insert additional names, or to add to, or take away from, such subpœna, and if additional names were inserted in the subpœnas by any one except the clerk, or his deputy, they were illegally inserted, and, not being his act, he would have no authority to charge for such names so inserted. We mean by the insertion of a name the writing of the same in a subpœna after it has been signed and verified by the clerk. That act would not be the act of the clerk, unless such insertion was made by the clerk or his deputy, or perhaps by some one in his immediate presence and at his instance and request. Although the subpœnas may have been prepared and the names inserted therein, by some one other than the clerk, still, if he afterwards signed and sealed the subpœnas, they became his act, and he would be entitled to recover the legal fees. In other respects than considering the assignments of error as requested, the motion for rehearing is overruled.