F. J. YOUNKER, Appellant, v. HORACE SUSONG et al., Appellees.

J. H. ANDERSON, Appellant, v. HORACE SUSONG et al., Appellees.

CONSTITUTIONAL LAW: Judicial Department—Justice of the
1  Peace Courts—Power to Abolish. A justice of the peace court is not of constitutional creation, and may be abolished at the will of the legislature.

CONSTITUTIONAL LAW: Construction, Etc.—Reluctance to Over-
2  throw Act—Municipal Court Act. Principle recognized that a legislative act will not be held unconstitutional unless it is "clearly, plainly and palpably" so.

ELECTIONS: Conduct of Elections—Voting Machines—Separate
3  Ballot on "Public Measures". A general order by the proper

public authorities for the use of voting machines does not deprive such authorities of the power to submit "public measures" to a vote by ordinary separate paper ballot, Sec. 1137-a27, Code Sup., 1913, specifically authorizing such course. So *held* in the submission in a city election of the proposition to establish a municipal court, as authorized by Sec. 694-c1, *et seq.*, Supplemental Sup. of 1915.

**ELECTIONS: Conduct of Election—Mistakes of Election Officials—Effect.** Where mistakes or omissions of election officials, and not of electors, are relied upon, prejudice must be shown in order to defeat an election fairly held.

**ELECTIONS: Conduct of Election—City Election—Order of Board of Supervisors.** An order of the board of supervisors under the Voting Machine Act (Title VI, Chap. 3-A, Code Sup., 1913) that voting machines be used throughout the county has no relation to, nor effect upon, the holding of a strictly city election.

**ELECTIONS: Conduct of Elections—Non-Fatal Irregularities—Failure to Furnish Election Booths.** The entire failure to furnish election booths is not such an irregularity as will invalidate an election, in the absence of a showing of prejudice.

SALINGER, J., dissents.

**ELECTIONS: Right of Suffrage—Sex Discrimination—"Increasing Tax Levy".** A woman, otherwise qualified, has the right, under Sec. 1131, Code, 1897, to vote on the question of the adoption of any public measure pending at a city, town, or school election, when the adoption and carrying out of such measure will *necessarily result* in "increasing the tax levy". So *held* on the question of adopting a municipal court.

EVANS, C. J., DEEMER and SALINGER, JJ., dissent.

**ELECTIONS: Registration—Preparation of Voting Lists—Irregularity of Registrars—Using Wrong Poll Lists—Effect.** A statute prescribing the powers and duties of registration officials should not be so construed as to make the right to vote of registered voters depend upon a strict observance by the registers of all the minute directions of the statute in preparing the voting lists, and thus render the constitutional right of suffrage liable to defeat, without the fault of the elector, by the fraud, caprice, ignorance or negligence of the registers. *Held*, the act of the registers in using the wrong set of preceding poll books was not such an irregularity as would invalidate an election.

PRINCIPLE APPLIED: The registers of voters in 1912 prepared an "Original Register of Voters for 1912, 1913, 1914 and 1915". Such was its title, and it appears to have been intended

as a "combination" book for these years. In preparing the registration books for the November, 1914, elections, the registers, instead of using the poll books of November, 1912, as directed by Sec. 1084, Code, 1897, used the poll books of the city election of March, 1914. With the names on this mistaken list, the "alphabetical" lists were prepared, and there was added thereto the names of those *then* newly registered. This list was duly corrected and certified as correct. These *new* names also were entered on the aforesaid "Original Register of Voters," etc. A "Hang-out" book for public inspection was also prepared in the same manner and form. A special election, being the first election since November, 1914, was called in 1915 to vote on the adoption of a municipal court. *For this election*, the registers used the 1914 "Alphabetical" and "Hang-out" book, adding thereto the names of those *then* newly registered, which new names were duly entered on the aforesaid "Original List of Voters", etc. These were all the books that were kept. No fraud was charged. *Held*, the irregularity did not invalidate the election.

    SALINGER, J., dissents.

*Appeal from Polk District Court.*—HUBERT UTTERBACK, Judge.

SATURDAY, JANUARY 22, 1916.

ACTIONS in equity. The two cases were submitted together, separate judgments to be entered. November 29, 1915, a special election was held in the city of Des Moines, at which election there was submitted to the voters the following question:

"Shall the propositions to establish a municipal court in the city of Des Moines, Iowa, under and by virtue of the provisions of Sections 694-c1 to 694-c51 of the Supplemental Supplement to the Code of Iowa, 1915, be adopted?"

The judges of election made return of the ballots to the city clerk, who, with the mayor, canvassed said returns and announced the vote at said election as follows: Votes cast in favor of the proposition: men 4,787, women 280; total affirmative votes, 5,067. Nays: men 4,834; women, 152; total negative vote, 4,986. The clerk and mayor further announced their intention and purpose to certify to the governor, secretary of state and the county auditor of Polk County that a majority of the votes cast at said election were in the affirma-

tive and that said proposition had carried. Plaintiffs allege that the election was not held according to law and is invalid. They ask an injunction against the clerk and mayor, acting as a board of canvassers, from certifying said returns; and that the mayor and commissioners of the city of Des Moines be enjoined from doing any act in providing for said court, the housing or equipping thereof, the raising by any means of public funds or the use of any public moneys for the maintenance of said court; and further, that said defendants be enjoined from providing for an election to nominate or elect judges, clerk or bailiff thereof, and for general equitable relief. A demurrer interposed by the defendants was sustained by the trial court, and the plaintiffs appeal.—*Affirmed.*

*Guy A. Miller* and *Halloran & Starkey,* for appellants.

*H. W. Byers, Eskil C. Carlson, Earl M. Steer* and *R. P. Thompson,* for appellees.

PRESTON, J.—As stated, the election was held on November 29, 1915, and soon thereafter, suit was brought in the district court and the case was there decided December 15, 1915. Appeal was taken to this court the next day and the case advanced and submitted in this court on December 17th. Counsel for both sides have filed memorandum briefs, which scarcely do more than state the points and cite the statutes and the cases. Decision is asked before January 1st and the opinion has been so written; though, because of a difference of opinion among members of the court, it may not be filed until after that date. These matters are mentioned to show that both counsel and the court have been necessarily hurried. Such haste is hardly fair to the court or counsel, and the decision under such circumstances is not always entirely satisfactory.

The provisions of the Supplement to the Code referred to in the question submitted provide for the establishment of municipal courts in cities in this state. When a proper peti-

tion is filed, it is made the duty of the mayor to submit the question to a vote of the people. The act further provides that, if the proposition is adopted, the judges of such court and the clerk and the bailiff shall be elected after proper nominations have been made; that, upon the election and qualification of the judges and other officers of such court, the police court, mayor's court, justices of the peace court and the superior court shall be abolished, and that the offices of the judges of such courts and the justices of the peace, constables and clerk of the superior court shall likewise be abolished; that the salary of each municipal judge shall be $2,500, and that of the clerk and bailiff, $1,200 per annum, and of deputies, such compensation as the council may allow, one half of the salaries of all such officers to be paid by the city, and the other half by the county; each judge may appoint a shorthand reporter, whose compensation shall be $6 a day. It is further provided that the city council shall provide a suitable place for holding said court, and all such other rooms and offices as shall be necessary for the transaction of the business of the court; and all other expenses not provided for in the act are to be apportioned and distributed one half to the city and one half to the county. There are many other provisions in the act not now material.

It should have been stated before that counsel have filed a stipulation of facts which are not referred to in the petition, but it is agreed that they shall be considered as a part of the petition or record in the case, to which the demurrer may apply.

There are five points relied upon by appellants:

(1) That the statute creating municipal courts is unconstitutional because of its provisions in abolishing justice courts, the claim being that the justice court in Iowa is a court created by the Constitution and may not be abolished by the legislature.

(2) Because at the election voting machines were not used.

(3) Because no booths were provided.

(4) Because women were permitted to vote.

(5) Because registration was not had, as required by the statute.

1. In Article 11, Section 1, of the Constitution of this state, under the head of "Miscellaneous", we find the following:

1. CONSTITUTIONAL LAW: judicial department: justice of the peace courts: power to abolish.

"The jurisdiction of justices of the peace shall extend to all civil cases (except cases in chancery, and cases where the question of title to real estate may arise), where the amount in controversy does not exceed one hundred dollars, and by the consent of parties may be extended to any amount not exceeding three hundred dollars."

It is doubtless true, as contended by appellants, that citizens of the state have the right to invoke the jurisdiction of justices of the peace in the settlement of their controversies within the limits provided; that is, they may do this so long as such courts are in existence. The office of justice of the peace was in fact created by the legislature. Article 11, Section 1, before referred to, is nothing more than a limitation upon the power of the legislature, in creating the office of justice of the peace, to fix its jurisdiction as to the amount involved in controversy. In the absence of further restriction in the Constitution, the legislature has authority to create any court it may desire. In Article 5, Section 1, of the Constitution, entitled "Judicial Department", it is provided:

"The judicial power shall be vested in a Supreme Court, district court, and such other courts, inferior to the Supreme Court, as the general assembly may, from time to time, establish."

Under this, the creation and organization of courts inferior to the Supreme Court, other than the district court, are left to the discretion of the legislature. There is no limitation upon the power of the legislature to create any court

that it may desire, except the Supreme and district courts mentioned therein. Justices of the peace and their office, not being of constitutional creation, may be established or abolished at the will of the legislature. *Crozier v. Lyons,* 72 Iowa 401; *State ex rel. Thomas v. Gunter,* (Ala.) 54 So. 283. We think that only the Supreme Court and district court are created by the Constitution, and other courts not specifically provided for in such constitutional provisions are, and may be, created by the legislature under the phrase, "and such other courts, inferior to the Supreme Court, as the general assembly may, from time to time, establish".

The municipal court act in question should not be held unconstitutional unless it is "clearly, plainly and palpably" so. *Burlington, C. R. & N R. Co. v. Dey,* 82 Iowa 312; *State v. Fairmont Creamery Co. of Neb.,* 153 Iowa 702; Lewis' Sutherland, Statutory Construction, Secs. 82 and 83 (2d Ed.). We are of the opinion that the act is not unconstitutional.

*2. CONSTITUTIONAL LAW: construction, etc.: reluctance to overthrow act: municipal court act.*

2. It is next contended by appellants that it was incumbent upon the officials having charge of the election in question to provide the voters with the voting machines heretofore adopted and ordered for use in elections in the voting precincts of Polk County by virtue of the resolution of the board of supervisors theretofore adopted in accordance with Section 1137-a8 of the Code Supplement, 1913. It should be stated that no officers were voted upon or elected at the so-called election in question.

*3. ELECTIONS: conduct of elections: voting machines: separate ballot on "public measures."*

It is contended by defendants that Sections 1137-a7 to 1137-a27 of the Code Sup., 1913, providing for the use of voting machines "at all state, county, city, town, primary and township elections hereafter held in the state of Iowa" apply only to elections of officers. Section 1137-a27 provides:

"All of the provisions of the election law now in force

and not inconsistent with the provisions of this act shall apply with full force to all counties, cities, and towns adopting the use of voting machines. Nothing in this act shall be construed as prohibiting the use of a separate ballot for constitutional amendments and other public measures."

The last clause of this section expressly authorizes the use of the separate ballot in submitting "other public measures", when the voting is by voting machine. This bill expressly comes under this head.

Statutes prescribing the mode of proceeding of public officers are regarded as directory unless there is something in the statute which shows a different intent. In the instant case, the electors were not to blame for the 4. ELECTIONS: conduct of election: mistakes of election officials: effect. failure of the officers to provide voting machines and booths; but the mistakes, if any, were those of the officials. Under such circumstances, prejudice must be shown in order to defeat an election fairly held. *Kinney v. Howard,* 133 Iowa 94, 103.

Legislative restrictions upon the exercise of the right of suffrage are enforced by the courts without hesitation to the very letter, so long as they relate to matters within the control of the individual voter. But, with respect to regulations regarding the conduct of others, the effort is to seek such a construction of the law as will accomplish, rather than defeat, the expressed wishes of the people. *Peabody v. Burch,* (Kan.) 89 Pac. 1016.

It is the duty of the court to sustain an election authorized by law if it has been so conducted as to give a free and fair expression of the popular will and the actual result thereof is clearly ascertained.

In the absence of fraud, where an election appears to have been fairly and honestly conducted, mere irregularities in the conduct of the election will not invalidate it, where it does not appear that the result was affected, although the circumstances may be such as to subject the officers to pun-

ishment. 15 Cyc. 316, 372; *Dishon v. Smith*, 10 Iowa 212; *State ex rel. Smith v. Burbridge*, (Fla.) 3 So. 869; *Cook v. State*, (Tenn.) 16 S. W. 471; *Altgelt v. Callaghan*, (Tex.) 144 S. W. 1166; *Lehigh Sewer P. & T. Co. v. Inc. Town of Lehigh*, 156 Iowa 386.

An election will not be declared void because the arrangement of the polling place, manner of placing booths, etc., was not according to law. *Conaty v. Gardner*, (Conn.) 52 Atl. 416; *Moyer v. Van de Vanter*, (Wash.) 41 Pac. 60; *Altgelt v. Callaghan*, *supra*. Our own cases are to the same effect. See *State v. Bernholtz*, 106 Iowa 157; *Cook v. Fisher*, 100 Iowa 27; *Lehigh, etc., Co. v. Inc. Town of Lehigh*, 156 Iowa at 396. These cases also have a bearing upon the registration and voting booths proposition in other paragraphs of this opinion.

Section 1137-a8 provides:

"Hereafter the board of county supervisors of any county, or the council of any incorporated city or town in the state of Iowa may, by a two-thirds vote, authorize, purchase, and order the use of voting machines in any one or more voting precincts within said county, city, or town, until otherwise ordered by said board of county supervisors or city or town council."

5. ELECTIONS: conduct of election: city election: order of board of supervisors.

The petition alleges that:

"The board of supervisors of the county of Polk and state of Iowa, in which the said city of Des Moines is located, had . . . ordered the use of voting machines in all voting precincts within said county, including the precincts in the said city of Des Moines in accordance with the provisions of Section 1137-a8 of the Code Supplement and had provided voting machines therefor and in said election . . . said voting machines were not used", etc.

Under this statute, the board of supervisors was not to have control over the use of voting machines at any city election. An election called by the city for some special city

purpose is done under the authority and control of the city council, and is not subject to a resolution and order of the board of supervisors.

3.   No voting booths were furnished or used in the election in question.  It was stipulated that the city of Des Moines was without booths for use at the special election in question; that the city clerk was not furnished with booths to be used by the several precincts of the city.  The allegation and claim of plaintiff with respect to the interference by judges of election are based upon the fact that in at least one instance one of the judges of election, without request from a voter presenting himself to vote, opened the ballot containing the proposition of the establishment or non-establishment of the municipal courts in the city of Des Moines, and stated to the prospective voter: "If you are opposed to the present system of justices of the peace and police court, which you are, you will vote 'yes,' " indicating on the ballot the place where he should mark the same.

6. ELECTIONS: conduct of elections: non-fatal irregularities: failure to furnish election booths.

Appellant's next contention is that, by virtue of the statutes, particularly Section 1113, it was incumbent upon the mayor and clerk to provide the necessary supplies and equipment for the holding of elections, including the booths for screening the voter while marking his ballot, and provide for the secrecy in such marking so that there could be no interference or influence upon a voter while exercising the right of suffrage.

Much that has been said in a prior division of the opinion in regard to voting machines is applicable to the point now under consideration in regard to the failure to furnish booths, and the cases cited on that proposition also have a bearing here, as do the cases on the question of registration.

In *Hayes v. Kirkwood*, (Cal.) 69 Pac. 30, in regard to the manner of placing election booths, it being claimed that the law in respect thereto had not been complied with, it was said:

"But in the case at bar it sufficiently appears that nothing prejudicial to the rights of anyone resulted from the irregularities and omissions complained of, and there is nothing to warrant the court in defeating the will of innocent voters. It must be remembered that neither the voters nor those voted for have any control over the officers of election, and to upset an election because such officers have failed to strictly comply with the law, where it appears that no harm was done thereby, would be to encourage irregularities committed for the very purpose of invalidating elections."

In *Perry v. Hackney*, (N. D.) 90 N. W. 483, it was held that the failure to provide the booths as required by the statute did not necessarily destroy the secrecy of the ballot and render the election void, and that the provisions of the statute were directory.

In the *Altgelt* case, *supra*, it was said:

"The provision of the law in regard to voting booths is for the purpose of obtaining secrecy of ballot and is peculiarly for the benefit of the voter, and, while the law in regard to voters' preparing their ballots in the booths should be enforced, the failure to do so would not invalidate the votes of those not using the booths."

In the *Moyer* case, *supra*, it was held that the fact that election officers failed to have booths erected which complied with the law was a mere irregularity and insufficient to vitiate the election. See *Kinney v. Howard, supra; Murphy v. City of Spokane*, (Wash.) 117 Pac. 476; *Short v. Gouger*, (Texas) 130 S. W. 267. In the last case, the ballots were printed on paper so thin that the marks thereon were seen through it. See, also, *McGrane v. County of Nez Perce*, (Idaho) 112 Pac. 312; *Dishon v. Smith, supra; State ex rel. Walklin v. Shanks*, (S. D.) 125 N. W. 122.

We are of the opinion that the election in question was not invalidated by the failure to use voting machines or booths.

4.   The next proposition relied upon by appellants is that women were allowed to vote, and that they were not, under the law, entitled to do so.   The position of appellants is that the question is one of increasing the tax levy, within the contemplation of Section 1131 of the Code, 1897.   They contend that the question of increasing the tax levy as contemplated by that section must either be one that directly, by virtue of the language of the proposition itself, confers upon the city council or the taxing body additional powers to do that which will require the expenditure of additional funds with respect to the tax levy than they theretofore possessed, or such that, by reason of its relation to the proposition as submitted, the adoption of the proposition will confer such authority, and they cite:   *Coggeshall v. City of Des Moines,* 138 Iowa 730; *Youngerman v. Murphy,* 107 Iowa 686.   The last case was referred to and distinguished in the *Coggeshall* case.   They contend also that what the legislature meant by the language, ''or on the question of increasing the tax levy'', as used in Section 1131, Code, 1897, is such a question as the statute in terms provides for by way of a direct proposition.   Such statutes increase the tax levy for specific purposes, and appellants say that many instances of this kind can be found in the statute, citing Code Sections 443, 759 and 760, and that it is on questions such as these that Section 1131 contemplates that women shall be entitled to vote.   Without quoting Section 1131 in full, it provides that at elections where women may vote, no registration of the women shall be required, and provides for separate ballot boxes, and the part material to the present inquiry is:

''The right of any citizen to vote at any city, town or school election, on the question of issuing any bonds for municipal or school purposes, and for the purpose of borrowing money, or on the question of increasing the tax levy, shall not be denied or abridged on account of sex.''

7. ELECTIONS: right of suffrage: sex discrimination: "increasing tax levy."

The statute as first adopted (Chapter 39, 25th General Assembly) read ''or for the purpose of increasing the tax levy''.

On the other hand, it is contended by appellees that by the terms of the act creating the municipal court an increase in the tax levy necessarily follows. This act in part is Code Supplemental Sup., 1915, Sections 694-c47, 694-c48 and 694-c49. They also cite and rely upon the *Coggeshall* case.

It is not alleged nor claimed by appellants that any of the provisions of the Constitution are violated by any of the sections of the statute cited. The *Coggeshall* case may not be directly in point, and there may be some discussion in that case not necessary to meet the point there decided, yet the reasoning there has a bearing in the instant case. It is manifest that by enacting Section 1131 of the Code the legislature intended to give some rights to women or extend their rights. The statute ought not to be given a too narrow or strict construction which would defeat the right of the women to vote, but rather a liberal construction in order that the purpose of the legislature may be carried out. In the *Coggeshall* case, the question was not whether a tax in any certain amount should be levied, but whether $350,000 should be raised by the levy of a tax, or the sale of bonds. The discussion in that case is that it is not necessary to specify the precise amount of bonds or tax. So in the instant case, under the act of the legislature and this vote, the city is authorized to establish these courts and do all the things necessary to put them in operation. It is useless to quibble about it; this vote carried out would increase the tax levy. In fact, though it is not suggested in argument, the petition in the *Younker* case alleges:

''Par. 8. That in order to carry out the intention and purpose of the commissioners as aforesaid and the council as aforesaid, it will be necessary to *increase the levy* for taxes within and for the city of Des Moines, Iowa.''

The allegation in the petition in the *Anderson* case is not quite as broad, perhaps. In Par. 9 thereof, it is alleged that the defendants:

"Intend and are about to expend public moneys to provide for the establishing of said court, including the books, records and equipment therefor, and intend to and are about to vote public moneys to pay salaries, judges, clerks, bailiffs and other *attachés* of said court, and intend to and are about to expend public moneys incident to holding an election of judges and other *attachés* of said court, as contemplated by Sections 694-c1 to c51 of the Supplemental Supplement to the Code of Iowa, 1915."

We shall see later on in the opinion that, if such money may be and is so spent, it must be replaced by the levy of other taxes, and that it is conceded in the stipulation of facts that the city has no funds on hand to spend for such purposes. This being so, if the municipal courts are established, it will be necessary to levy taxes to provide for them.

On the face of the act itself, the city may be and is authorized· by the vote of the people at the election in question to do the things which will necessarily increase the tax. The section of the Code in question means that, where taxation is. a burden and where property of women is burdened with such tax, as is the property of men, then the women have a right to be heard and to vote on such propositions. It may be that the city is not compelled to establish these courts, a point which we do not determine. The question of the right of the women to vote does not depend upon the question as to whether they are in fact established. The city is at least authorized by the vote, under the act of the legislature, to do so, and, if it does, this will, as stated, necessarily increase the tax levy. It would not do to say that women may vote if a city hall is built, as in the *Coggeshall* case, or if, as here, municipal courts are established, but that, if the city hall is not built or the courts not established, though the city is authorized to do so, the vote is for that reason illegal.

Nor do we think it material to consider evidence as to how much profit, if any, there might be by establishing or failing to establish such courts. If the city had money on hand to furnish court rooms and pay the other expenses in carrying out this act and the vote, and would have the right to do so, it would be necessary to make a new levy to take the place of money so expended. But it is stipulated that the city has no funds on hand. A majority of the court is of the opinion that the referendum vote on the question of establish. ing these courts, or the so-called election, is not invalidated because the women were permitted to vote.

We interpret the statute. as it is written; yet we may well keep in view the steady progress of our state legislation for many years toward the complete emancipation of woman from the disabilities and discriminations formerly imposed upon her by the law, until now the constitutional restriction which denies her entire equality at the polls is practically the last surviving badge of her supposed inferiority in personal, civil or civic rights. The legislature could not, at the time Section 1131 of the Code was enacted, constitutionally grant woman the right to vote for public officers, but it could allow her to vote upon such questions of public policy as might be submitted to popular referendum, and thus in some measure protect her own rights as a citizen and property owner. And this, we think, is what the statute attempts to do. That intent being apparent, the court should indulge in no refined distinctions to defeat the legislative purpose or to minimize its operation or effect. While the presence of woman at the polls is an innovation, which all do not view with equal equanimity or satisfaction, yet to my mind it is difficult to imagine any good reason why she who is man's equal in other rights of person and property and has no less interest than he in good government and social order, should not equally with him make her voice heard and her influence felt at the ballot box where all questions affecting the common good are put to their final test. When that time arrives, and equality in

fact, as well as in name, is accomplished, may we not confidently expect an advanced standard of good citizenship and a more truly republican form of government?

5. Lastly, it is contended that the board of registers in the different precincts of the city failed in the performance of their duties as defined by Sections 1079 and 1084 of the Code of 1897. It is conceded by both sides that the city of Des Moines is such a city as that the registration of voters is required, and it is conceded by the defendants that the statute requiring registration is mandatory, that an election without registration would be illegal; but they contend that the manner, form and time within which registration officers must perform their duties are not mandatory, and a failure in these respects would not invalidate an election otherwise legally and properly held. As we understand it, they do not at this point contend that the referendum vote in question was not an election. Section 1084 of the statute is as follows:

8. ELECTIONS: registration: preparation of voting lists: irregularity of registrars: using wrong poll lists: effect.

"Sec. 1084. A new registry of voters shall be taken in each year of a presidential election. For all other state or municipal elections, general or special, the registers shall prepare a new registry book in each year, by copying from the poll book of the preceding general election all the names found therein, adding thereto those of all persons registered and voting at any subsequent election, which new registry book shall show all the facts of qualification of each voter as they appear on the last preceding registry book, which, when thus made up, shall be used at each election until a new registry book is prepared as required by law. Every person thus registered shall be considered as entitled to vote at any election at which said registry book may be used, unless his name shall be dropped by the correction of registration, as authorized by law."

It is contended by appellants that the effect of the provisions of Section 1084 is to require a person who has registered

in the manner set out in Section 1077 of the Code Sup. of 1913 to vote at all subsequent general elections, in order to maintain his status as a registered voter, and, if he fails to vote at any such general election, then he is to clothe himself with that status by registering anew; that the same section also requires the making of a new registration each year, but obviates the necessity of every voter's presenting himself for registration by permitting the copying of the names from the poll book of the preceding general election. The contention of appellants is that, unless the voter is registered as required by Section 1084, he is not a qualified voter, and that any such person voting would be an illegal voter, and his vote would be illegal. It is contended by appellants that the provisions of this statute were not complied with, nor were the provisions of Section 1079 of the Code, 1897, complied with, in that the registers, instead of making a new registry book from the poll book of the preceding general election, as required by statute, entered the names of persons who presented themselves in person and registered for the election of November 29, 1915, on the alphabetical lists used in the election of 1914; that in the preparation of the registry book of 1914 the law was not complied with, for that, in copying the names from the poll books of the preceding general election, the registers copied the names from the poll book of the preceding city election held in March of that year.

It is contended by plaintiffs that, in place of copying the names from the poll book of the preceding general election, the registers copied the names from the poll book of the preceding city election held in March of that year, so that in the election of November, 1914, the law was not complied with in regard to the registration of voters, nor was it complied with in the election in controversy in 1915. They say that there were only 2,931 new names added by personal registration for the election of November 29, 1915, and while these new names were not placed upon a new registry book as contemplated by Section 1084, still they concede that for the purposes of this

case such voters were registered as contemplated by law and were entitled to vote, but that the others exercising the right of voting were not registered according to law, and therefore were not qualified voters. The record shows that over 9,000 men voted in the election on the proposition involved, and plaintiffs contend that more than 6,000 unregistered voters voted in said election, and that the failure of the registration officers to comply with the law will invalidate the entire election.

We should set out more fully here just what was done in regard to the registration books as shown by the record. It appears that the election in question on November 29th was the only election held in Des Moines subsequent to the general state election in November, 1914; that in preparation for the election in November, 1914, the registration board for the several precincts in the city of Des Moines proceeded as follows:

"The poll book of the general municipal election held in March, 1914, was taken by the registers of the several precincts of the city and all of the names appearing on such poll book as having voted at the general city election of 1914 were copied into a book entitled 'Judges' alphabetical list of registered voters in the ..... precinct of ..... ward of the city of Des Moines, state of Iowa', and in which book along the upper margin appears the following, 'Registration of voters, ....... precinct ....... ward, city of Des Moines, county of Polk, state of Iowa', and where I say blank these books did have the precinct and ward in this blank. In the space below in the record just read appears the following: In the first column, 'Name'; next column, 'Age'; next column, 'Register Number'; next column, 'Residence, street and number'; next column, 'Nativity'; next column, 'Color'; next column, 'Term of residence in precinct'; next column, 'Term of residence on street'; next column, 'Term of residence at number'; next column, 'Term of residence in county'; next column, 'Term of residence in state'; next column, 'Naturalized';

next in a double column, 'Date of papers, month, day and year'; next column, 'Court, county and state'; next column, 'By act of Congress'; next column, 'Qualified voter'; next is a double column with the heading, 'Date of application for registration', and below that, 'Month, day, year'; next column, 'Last preceding place of residence'; next column, 'Date of removal in within one year, month, day, year'; and the last column, 'Signature'. •That at the beginning of each of these books from which I have just been reading are found the following certificates: 'Certificate of attestation', that is the heading; and 'We, ................ and ................, the board of registration, ........... precinct ........... ward, hereby certify that the foregoing names from No. ..... to No. ..... are a true copy of the registration list. Witness our hands this ......... day of ...................., 1914.' Seal. Space for signature. Seal. Space for signature; followed by the term 'Board of Registration'. There are in each book four of such blanks. That in addition to the lists or book or whatever it may be termed, just referred to, what is designated as a hang-out registration book was also prepared by the registers, the book on the outside being designated as 'Hang-out registration book, ......... precinct of ......... ward city of Des Moines'. Then a copy of section 1135 of the Code of Iowa. Inside of this sheet called 'Hang-out book', in addition to being lettered alphabetically arranged, there is the following data or information: 'Registration of voters ........ precinct ........ ward city of Des Moines, county of Polk, state of Iowa'; and the balance of the printed matter appearing in the 'Hang-out book' being exactly similar in words and figures to that read from the 'Judges' alphabetical list'. That said alphabetical list, when so made up, contained all of the names of the voters of the city of Des Moines whose names appeared on the poll books of the regular city election for 1914, and names of all persons who appeared and were registered by the registration board just prior to the general election in 1914. That in making up said alphabetical list

the registers after taking all of the names of qualified electors and writing them in the alphabetical list and hang-out list, and registration book, then met and checked over the lists for the names of voters who had changed their residence from one precinct to another, and in all cases where such change had been made the registers issued what is known as a 'Certificate to strike off names of voters that have changed their voting precinct'. These certificates were made up and exchanged, and from them the alphabetical lists were corrected. That the several boards of registers in preparing for the 1914 regular state election entered the names of all persons who appeared and were qualified for registration for the election of 1914 in the original registration book which was made in 1912, such names all being in addition to the names already appearing in said registration book and that no names of voters were copied from the poll books used at the general city election in 1914 into the original registry book of 1912, or registry book that was prepared for use for 1912, 1913, 1914, 1915. That in preparing the alphabetical list and hang-out book for the special election in question in this controversy, the judges' alphabetical list of registered voters which has already been referred to was used, and under the names appearing in that book as registered voters for 1914 there was added all of the names of persons who were registered on the three days fixed by law just preceding said special election, so that the judges' alphabetical list and the hang-out book which was used for the special election on November 29, 1915, contained all of the names that the judges' alphabetical list for the general election of 1914 contained, and in addition thereto the names of the newly registered voters for the special election in question. That the total number of newly registered voters for the special election in question was 2,931.

"It appears also that prior to the election held in November, 1912, an original register of voters was duly and properly made up, and the names of the voters registered in a book entitled 'Original register of voters in the ........ precinct

of ........ ward of the city of Des Moines, state of Iowa, for the years 1912, 1913, 1914, and 1915', said register book having printed on the inside of the cover the form of oath required by the statute, the certificate of appointment by the city clerk, and the oath of the registers. That in addition to the printed matter just referred to the book was ruled in column, and at the top of each page is found exactly the same data, the same headings, and the columns as is found in the so-called 'judges' alphabetical list', and for the purpose of this record and the ruling on the demurrer, the three books hereinbefore referred to, 'The original register of voters', 'The judges' alphabetical list', and 'The hang-out registration book' used in the first precinct of the third ward at the special election in question may be marked as exhibits and considered in evidence.

"That no other registration books of any kind were made or prepared by the registers for use at elections in the city of Des Moines subsequent to 1912, except the three exhibits above referred to, and similar books and lists for the other precincts of the city."

It appears that at the election held on November 29, 1915, at least 89 persons voted whose names appeared on the alphabetical list before referred to, but who did not vote at the 1914 election, and whose names did not appear upon the poll books of the election held in November, 1914. It is enough to say in regard to these 89 votes that it is not alleged in the petition, nor does it appear anywhere in the record, how these 89 voted. They may have all voted against the proposition, and in that case there could be no prejudice.

It must be admitted from this record that there was not a strict observance of the registration laws by the registration officers. But it is clear that such officers attempted to provide a means for ascertaining the citizens who shall be entitled to vote, and this is the purpose of the registration laws. It is not claimed that there was any fraud or corruption on the part of any of the election officers. A registration of some sort was had and new names were added to the lists contained in

prior poll books, and we think that there was a substantial compliance with the statute in so far as to ascertain and furnish a list of voters entitled to vote. So that, even if the officers whose duty it was to prepare the poll books and the voting lists did not strictly follow the statute, the voters were in no manner to blame, and they should not be deprived of their right to vote because of some mistake of the registration officers. It ought not to be the law that each voter about to register, or who is entitled to have his name brought forward on a new list, must, at the peril of losing his right to vote, take an attorney with him to see that the registration officers perform their duty. We fail to see how anyone was prejudiced by the error, if any, of the registration officers.

In *People ex rel. Johnson v. Earl*, (Colo.) 94 Pac. 294, it was claimed that a certain election was illegal because the registration lists used at the election were not made within the time limited by law, through the fault of the registration officers, and that as a result a large number of electors of the city were deprived of the right of registration, and the right to cast votes at the election. In that case the court said:

"Statutes prescribing the manner, form, and time within which public officers are required to discharge public functions are regarded as directory, unless there is something in the statute which shows a different intent. Hence, as a general rule, statutes prescribing the power and duties of registration officers should not be so construed as to make the right to vote by registered voters dependent upon a strict observance by such officers of all the minute directions of the statute in the preparation of registration lists, and thus defeat the constitutional right of suffrage, without the fault of the elector; for, if an exact compliance by these officers in matters of manner, form, and time shall be held to be essential to the right of the elector to vote, elections would often fail, and electors would be deprived, without their fault, of the opportunity to vote. . . . The rule is well established that those requirements of a statute which are manda-

tory must be strictly construed, while those requirements which are directory should receive a liberal construction, to the accomplishment of the intent and purpose of the law. Those requirements are mandatory which affect the results or merits of the election. Others are directory.''

The rule is stated in Cyc. thus:

''Statutes prescribing the mode of proceeding of public officers are regarded as directory unless there is something in the statute which shows a different intent. Hence, as a general rule, a statute prescribing the powers and duties of registration officers should not be so construed as to make the right to vote by registered voters depend upon a strict observance by the registrars of all the minute directions of the statute in preparing the voting list, and thus render the constitutional right of suffrage liable to be defeated, without the fault of the elector, by the fraud, caprice, ignorance, or negligence of the registrars; for if an exact compliance by these officers with all statutory directions should be deemed essential to the right of an elector to vote, elections would often fail, and electors would be deprived without their fault of an opportunity to vote.'' 15 Cyc. 307 (H.).

The cases cited in paragraphs of the opinion in regard to voting machines and booths also bear upon this proposition. Although, as stated, there were some irregularities on the part of the registration officers, we are of opinion that under the record such irregularities were not such as to invalidate the election. We have noticed all the points relied upon by appellants and our conclusion is that the judgments of the trial court in sustaining the demurrers to the petition in both cases were right, and such judgments are—*Affirmed.*

WEAVER and GAYNOR, JJ., concur; LADD, J., concurs, but wishes to be understood as not expressing any opinion as to the attitude of the legislature or probable action of the people.

EVANS, C. J., DEEMER and SALINGER, JJ., dissent.

EVANS, C. J. (Dissenting).—I disagree with the fourth division of the majority opinion. This pertains to the right of women to vote at the municipal election and involves the construction of Section 1131 of the Code, 1897, which provides as follows:

"The right of any citizen to vote at any city, town or school election, on the question of issuing any bonds for municipal or school purposes, and for the purpose of borrowing money, or on the question of increasing the tax levy, shall not be denied or abridged on account of sex."

The particular clause involved herein, as stated in the majority opinion, is, "on the question of increasing the tax levy". The majority opinion assumes to adopt what is called a "liberal construction", rather than a "narrow or strict construction which would defeat the right of the women to vote".

I am impressed that the majority has adopted neither a *narrow* nor a *liberal* construction of this statute, but has, with unfeigned chivalry, added something to the statute, and has triumphantly beaten the legislature to the final goal which is assumed to be near at hand. We may safely assume that women are to be fully emancipated from political disability. That emancipation, however, must ultimately come through legislative enactment. Such legislation, when it comes, ought to require no judicial construction; nor will it be likely to be open to any difference of opinion as to its meaning. The statute before us is simple and definite in its terms. Let it be borne in mind that the legislature has conferred upon taxing boards the power to make levies up to a certain maximum and subject to certain limitations. Up to such maximum, the power of a taxing board is complete and is not dependent upon a referendum vote. At the election under consideration, "the question of increasing the tax levy" was not submitted. It is said, however, that the adoption of the municipal court will necessarily involve expense, and such expense will necessarily be paid by increasing the levies. There is nothing in the record before us from which it can be said whether the adoption of the court in question will result in profit or in loss

to the municipality. The adoption of that system is a substitution. It involves an abolishment of the police court and the justice court. It does appear in the record that the police court of the city has yielded an average profit of $20,000 a year to the city treasury. The written opinion of the learned district judge was based at this point upon the assumption that the abolishment of the police court would involve a loss of $20,000 a year to the city and that this would necessarily increase the tax levy. This is not the ground adopted in the majority opinion, but it illustrates how difficult it is logically to attach to this statute the meaning thus declared.

Questions affecting the right of suffrage necessarily affect directly hundreds of thousands of voters. It is important that statutes affecting such right be so plain that they may be read and understood alike by such thousands. To that end, it is equally important that there shall be no departure by judicial construction from the plain and simple terms used in such statutes. That a statute of suffrage may be so read by one voter that he believes himself entitled to vote, and by another that he believes himself not entitled to vote, operates to the disfranchisement of the one or the false voting of the other; and, by the very divergence thus created, operates unequally and towards false results. The facts of the case before us present a striking illustration. At this election more than 9,600 votes of men were cast, resulting in a slight majority against the proposition voted upon. 432 votes of women were cast, resulting in a slightly larger majority in favor of the proposition. Adopting the majority view, we may safely assume that there were as many women in the city of Des Moines entitled to vote as there were men who voted, viz., 9,600. Only 432 voted. Why? It would be a grave indictment against the sex to say that they spurned the privilege. Manifestly, their reading of the statute now before us did not invite their attendance at the polls. The result is that more than 9,000 women were disfranchised, and less than 500 women who appeared at the polls, are permitted to deter-

mine the result, because this particular statute failed to express the meaning which the majority opinion now attaches to it. This illustrates not only the importance that statutes should be plain and definite in their terms, but also that nothing additional should be read into them by the courts when they *are* plain and definite in their terms. When the judicial construction of a statute amounts to a discovery of unsuspected law, it usually, if not always, becomes a pitfall rather than a promoter of equality or equity. I would read the statute as it is written, neither adding thereto nor subtracting therefrom.

As to the other features of the majority opinion, I concur. Justice Deemer joins in this dissent.

SALINGER, J. (Dissenting.)—I. The majority rules that the words of Section 1131 of the Code of 1897, which permit women to vote "on the question of increasing the tax levy" grant them the right to vote on whether a municipal court shall be established. These quoted words must be construed either "according to the context or the approved usage of the language", or else according to "such peculiar and appropriate meaning in law" as they "may have acquired". It is not vital with me that I think "tax levy" has acquired such meaning in law, because I am firmly persuaded that on neither of said rules of construction is "on the question of increasing the tax levy" the equivalent of "on the question whether a municipal court shall be established". Later, I shall attempt to show that the section of the Code which gives women the right to vote on some questions is an exception to the system of laws of which it is a part and must, therefore, be interpreted by what is termed strict construction. Assuming for the present that this section of the Code is such exception, it follows that its plain words may not be enlarged by strained and irrelevant reasoning—by attempts "to quibble"—to use words with which the majority characterizes all reasoning against the conclusion which it reaches. I regret that it seems to me to follow from this that one cannot get to relevant dis-

cussion of what is the proper construction of this statute until much that is said by the majority is swept out of the path.

Why must we consider the general attitude of Iowa general assemblies towards the rights of women, "for many years", in interpreting the plain words that one such body has written into this statute? Friendly assemblies might permit women to vote on many things and not include the right to vote on the establishment of municipal courts. Wherefore, that they were friendly is no evidence that they gave this particular permission. Such courts are a quite recent development, and many an assembly that helped year on year to make the friendly legislative trend which the majority invokes as an argument, had their being and met their end before such courts were thought of. That 50 years ago an Iowa legislature licensed women to become wireless telegraph operators because it was friendly to advancement of womankind would be a proper capstone for this "argument". Again, assemblies less friendly might, as a sop, grant the relatively unimportant right to vote on the establishment of this court— quite of no consequence to the large body of Iowa women— and fail to grant voting rights of real general value, say on whether bonds for school purposes should be issued. In a word, since a friendly legislature might not grant it, and one less friendly might, the fact that legislatures have been friendly quite generally, and for many years, is no proof that a particular section of the present Code permits women to vote on whether a city court should be established.

Those things which prove that there is a general friendly trend in Iowa legislation were not done all at one time. They were parts of an evolution. It is because some legislature took the first, another took a second, and still another the third, step in this evolution by the granting of some right that women had not theretofore possessed, that it is truth that general legislative progress has been made to enfranchise them. Following the majority to the bitter end, this would demon-

strate that, since the first and the second and the third assemblies were friendly, and each passed some act that proves that they were, therefore, the second legislature enacted what did not become a statute until the third legislature made it one. That there has been "steady progress of our state legislature for many years" toward removing disabilities imposed on women, does no more prove that a right to vote on a particular question has been given than the fact that a farmer is steadily progressive proves that he has Yale locks on the doors of his house. The majority is warranted by conditions in saying what it does in effect say—that sentiment is constantly growing for the belief that no good reason exists for denying full participation in civic administration on account of sex. This is a steady progress towards full enfranchisement. On the reasoning of the opinion, this friendly attitude, steadily and progressively grown stronger, is evidence that the Constitution has been amended to permit women to vote on all that men vote on. The one flaw in the chain of this reasoning is that the Constitution has not yet been thus amended.

And again: If what the majority asserts is true equally whether this particular statute has or has not been enacted at all, or, the statute having been enacted, yet what is asserted would remain true though all men conceded that as enacted it does not give women the right to vote on establishing courts—how can the fact that what is asserted is true be any evidence that this statute gives the right to vote on this question? Some people do not pay their debts, no matter what provisions are made by statute for collecting debts. Would the fact that many people do not pay their debts be evidence that a certain section of the Code had provided a specified means of collecting? Let us agree that there has been "steady progress of our state legislature for many years toward the complete emancipation of woman from her disabilities and discriminations formerly imposed upon her by the law"; and agree that "it is difficult to imagine any good reason why she, who is man's equal in other rights of person and property, and has

no less interest than he in good government and social order, should not equally with him make her voice heard and her influence felt at the ballot box, where all questions affecting the common good are put to their common test''; and also agree that, ''when that time arrives and equality in fact as well as in name is accomplished'', we may ''confidently expect an advanced standard of good citizenship and a more truly republican form of government''. But would not all this be as true if Section 1131, Code, 1897, had never been enacted, or, if enacted, it confessedly did not give women the right to vote on whether municipal courts should be established? If this statute had not been enacted at all, it would be just as difficult to imagine a good reason why women should not be permitted to help influence for the common good at the ballot box. If it were confessed that the women of Des Moines did not have the right to vote on the referendum in question, it would be as true as ever that one might confidently expect that her participation in governing the republic by the ballot box would promote an advanced standard of good citizenship, and a more truly republican form of government. As said, since all that the majority advances here will be exactly as true though no statute permitting women to vote on court establishment had ever been passed, the truth of what is asserted can by no possibility prove that the legislature has given this particular permission.

2. I agree that, though the legislature could not constitutionally enact that women might vote for public officers, it could give them the right to vote ''upon such questions of public policy as might be submitted to popular referendum''. I agree that to do this would ''in some measure protect her own rights as a citizen and property owner'', but am constrained to deny that because the legislature might have thus authorized, it therefrom follows that this ''is what the statute attempts to do''. An attempt to demonstrate why deducing in this fashion is not warranted has been already made.

It must be said, in addition, that this particular claim of

the majority proves altogether too much. If Section 1131, Code, 1897, is broad enough to permit women to vote on every question of public policy submitted to popular referendum, provided either affirmance or rejection affects or may affect their rights as citizens and property owners then this section of the statute which is so written as to plainly indicate that the right to vote therein given is given as an exception to general rules, and upon clearly specified questions alone, will no longer, upon mere inspection, be any guide as to what women may vote on. That right will depend upon the outcome of a debate over what is a correct analysis of the general class to which the proposition belongs, and of the possible consequences, respectively, of carrying or defeating such proposition, instead of upon consideration which looks only to whether the proposal is one specified by the statute which is confessedly the sole authority for voting on any proposition. The investigation will not be of what the Code says, but of whether the question submitted is one as to which it may be claimed that it involves a question of public policy which in some measure protects the rights of woman as a citizen and property owner.

This construction is certainly broad enough to permit women to vote on questions that are not even suggested in Sec. 1131, Code, 1897. Suppose we had a law, as some states do have, under which a referendum vote is taken on whether intoxicating liquors shall be sold for a stated future period. *Hall v. City of Madison,* (Wis.) 107 N. W., at 33, left column. On the construction of the majority, Section 1131, Code, 1897, would permit women to vote on that referendum. For it may not be doubted that the question involves public policy, and that women, especially, have much in the settlement of such a question which involves not only in a measure, but in a great measure, protecting their rights as citizens and property owners. Section 1131 is an exception and in terms limits her right to vote to the questions of "issuing any bonds for municipal or school purposes, and for the purpose of borrow-

ing money, or on the question of increasing the tax levy".
On the face of it, voting on the referendum as to whether
intoxicating liquors shall be sold is not included. But, in
effect, the opinion says that she may vote on licensing saloons;
of course, not because the statute so says, but because it can
be proved that the referendum involves a question of public
policy, whose settlement may in a measure bear on the pro-
tection of the rights of woman as a citizen and property owner.
In other words, "Shall saloons be licensed for the year next
following?" is equivalent to the question, "Shall any bonds
be issued for municipal or school purposes?" or to the ques-
tion, "Shall there be money borrowed?" or to the question,
"Shall the tax levy be increased?"

Whether a city shall establish and maintain parks—
municipal lungs that enable the children of the community to
grow up strong and healthy—concededly involves public
policy, and, clearly, women are especially and deeply inter-
ested. Manifestly, whether such parks shall or shall not be
bought and maintained at the expense of the taxpayer involves
her rights as a citizen. Therefore, the narrow language of
Section 1131, Code, 1897, authorizes her to vote on this propo-
sition. On the same reasoning, this statute permits her to
vote on whether a sewer system or a drainage district shall be
established and maintained, or a paving enterprise initiated.
If the establishing of the park or these other civic enterprises
did not involve the creation of a penny of debt, they would
still be questions of public policy, affecting the rights and
privileges of all citizens. If they involve expenditure and
resulting additional tax burdens, they are clearly measures
which affect, or may affect, all citizens who are property
owners.

Whether a high power means for rapid transit shall be
permitted to occupy the streets involves naturally, though
potentially, increased danger to life and limb to all who must
pass upon these streets. It may mean the shutting off of light
and access to property abutting, for which damages are com-

pensation in theory only; may involve the expense of additional policemen and the repaving of streets. The proposition to grant such franchise is one of public policy always; it affects the rights and privileges of the citizens as such always. It does or may affect them as taxpayers. Therefore, the right to vote on whether municipal or school bonds shall be issued, or whether money shall be borrowed by a city, town or school district, or whether the tax levy in such units of government shall be increased, authorizes women to vote on whether a trolley line shall be given a franchise.

Up to the time that the majority rewrote it, the statute limited the suffrage rights of women to voting on questions of issuing bonds for municipal or school purposes, borrowing money, or increasing the tax levy. As by it rewritten or amended, the statute authorizes them to vote on anything that involves public policy, providing that voting thereon is a means of in some measure protecting their rights as citizens and property owners.

The answer to all this is that, when the question before a court is whether a specific statute has granted a specified right, no sound canon of construction enables it to affirm that such right has been granted, merely because there is a tendency to grant it, no good reason for denying it, and it would be a benefit to humanity if it were granted. Such arguments may most properly be employed in urging a legislature to grant this right; they may most properly be addressed to assemblages of electors for the purpose of promoting sentiment and organization that will ultimately obtain the right, but it seems to me that they are not available to a court in construing the plain words of a statute that has already been passed. No matter how desirable and beneficial it is that women should have the right to vote on some particular question, this can never be proof that certain written words have given them that right. Once depart from this self-evidently right standard of construction, and there is no longer a substantial need which justifies the expense, and the loss of time

to the members, involved in convening a session of the general assembly. Whenever the time comes that statutes enacted by the assembly can be enlarged beyond their plain language because the supreme court thinks enlargement is desirable, beneficial and just, it will be cheaper to save it the labor and embarrassment of wrestling with what the legislature has written, and to give the court power in the first instance to declare anything to be the law which in the judgment of the court is good public policy, or removes what it thinks is an unjustified discrimination or disability. And it will work no change for those who employ lawyers to advise on what the law is. There is no practical difference between being told that the legislature has declared what the law seems to be, but that the Supreme Court may at any time amend it retrospectively, and being advised that it cannot be known what the law is, except by doing what is proposed, and then finding out on appeal whether there was a right to do it.

No better summing up of my attitude may be found than the following words of Mr. Justice Marshall, dissenting in *Hall v. City,* (Wis.) 107 N. W. 31, 37:

"So we have now here for consideration only a cold question of law. Warm it all we may with beautiful expressions as to the broad field of woman's influence, and her disposition to fully occupy it; illuminate it all we can by the light of right public policy, it remains a question of law still, not one as to what the law ought to be, or what we would have it to be, but of what it in fact is, as voiced by the lawmaking power and declared by this court. I would not willingly yield to anyone in thought or expression or deed in paying tribute to the capacity and disposition and accomplishments of woman in moulding the destinies of children. I could sit, as it were, at the feet of motherhood in supreme satisfaction and veneration, singing praises before the mind's personification of its beauty and grandeur and usefulness, towering above all other things in preparing the young to cope successfully in the activities of life. But however much I may think womankind should be

allowed and in fact should participate in governmental affairs 'pertaining to school matters', I must face the stern fact that courts do not make the law; they only declare it as they find it.''

In his further words, I desire to add, ''that I do not intend to suggest want of appreciation of that situation by others: to claim the slightest superiority in that regard for myself. It is only to emphasize the point of view from which I take my observation of the written and the unwritten law on the subject in hand.''

3. In support of another argument which has some family resemblance to others already commented upon, the opinion points out that the act authorizing municipal courts provides for stated salaries for municipal judges, and for a clerk and a bailiff, and for payment to deputies of such compensation as the council may allow; that it authorizes each judge to appoint a shorthand reporter whose compensation shall be $6 per day; that half of the salaries of such officers and also of all expenditures shall be paid by the city and the other half by the county; and (from which it does not at all follow that more than renting a building will be needed) that the council shall provide a suitable place for holding the court, and for the accommodation of the officers of the court. It is also pointed out that the new court and the officers thereof shall, *ipso facto*, supplant any superior, mayor's, police, and justice of the peace courts, and the officers of said courts.

It is said that ''The city is at least authorized by the vote under this act to do so, and, if it does, this will necessarily increase the tax levy''; attention is called to it that it is conceded in a stipulation that the city has no funds on hand to. spend for the purpose of establishing a municipal court; and further said that ''if the city had money on hand to furnish court rooms and pay the other expenses in carrying out this act and the vote, and would have the right to do so, it would ] ᴏ necessary to make a new levy to take the place of money so . ᴖended.''

What this manifestly states and claims is this: 1. It will cost money to establish and operate the new court. 2. The city has not on hand at this time, any funds wherewith "to furnish court rooms and pay the other expenses in carrying out this act and the vote." Therefore, it will never have any such funds on hand, unless it does what will "necessarily increase the tax levy". This is "fortified" with reasoning that it must be assumed without any evidence, (1) that no use of the present tax levy will be able to get in funds not now on hand in amounts sufficient to meet these expenditures minus what will come in from fees, and (2) that,—the same assumption in a different form,—though there were money sufficient in hand and it were used for the purpose, "it would be necessary to make a new (and increased) levy to take the place of money so expended".

The mere stating of this set of "corollaries" is a sufficient disproof of them. To cap the climax—possibly in recognition of how weak the argument is for the proposition that an increased levy must result—it is said, I think in terms, but certainly in effect, that it is not material the proof fails to show that there will be an increased levy.

That it is immaterial "to consider evidence as to how much profit, if any, there might be by establishing or failing to establish such courts", and that "the question of the right of women to vote does not depend upon the question as to whether they are, in fact, established", because "the city is at least authorized by the vote  .  .  .  to do so", is to me utterly inexplicable. The very life of any claim that women were entitled to vote at this referendum is that the question submitted was the equivalent of whether the tax levy should be increased. Without evidence that the court would ever be established, and, if established, of what it would cost to establish and maintain it above the sums received by way of fees and those saved over expenditures under the system supplanted by this court, it is impossible to find that there ever would be a tax levy for that purpose—much less an increased levy. This

failure of proof is immaterial upon just one theory, and that is the one the majority adopts, to wit, that voting "yes" on the question "Shall a municipal court be established?", with an appreciation that it may cost more money than will be taken in through fees, is equivalent to voting "yes" on the question "Shall the tax levy be increased for the purpose of establishing a municipal court?" Stated differently, one who votes for an establishment that may or may not cost more than it brings in is, as a matter of law, voting for an increase in the tax levy.

Concede that the voters thought of it as a possibility that the court might not earn all that it would cost, and that some of them had in mind that an increased tax levy would or might therefore result, it is still unbelievable that, when the legislature said women might vote "on the question of increasing the tax levy", it thereby intended to give them the right to vote "on any proposition if it is debatable whether carrying same out will cost more than is received, and it is therefore possible there will be an increased levy." These are not alike in words. The majority thinks that they are equivalents, in effect, on the reasoning that, if one be empowered to act, he is authorized to do all that may or might be required to effectuate such act. But see Chapter 34 of 32d G. A. Now, if that be sound, the woman vote on this proposition would be legal if the statute did not grant them the right to vote on "increasing the tax levy". On the reasoning of the opinion, voting on the establishment of a municipal court is as well authorized by the permit to vote "on the question of issuing any bonds for municipal or school purposes", or by the permission to vote on "borrowing money". For a municipal court is something for municipal purposes; and to establish one, especially if a building be erected, may require borrowing, or the issuing of bonds, precisely as much as it may require the increasing of the tax levy. On this reasoning, it would be quite immaterial that either specification was omitted, for either left in would give as much authority as any omitted.

If the question whether such court shall be established submits whether the tax levy shall be increased, it just as much submits whether money shall be borrowed or bonds issued—and *eo converso*. Neither of them is found in the proposal to establish the court. Either might result from establishing it.

If it was the legislative intent to permit woman to vote upon anything that might add to her burdens as a taxpayer, the specific permit to vote if the tax levy be increased is useless, because it is included in and less broad than adding to tax burden. For compelling the paying of taxes for a civic enterprise is a burden, though the tax levy be not increased. If her money were not needed for such enterprise, a decrease in the tax levy might be found justified, and her burdens lightened.

By excepting the right to vote on the selection of officers, which cannot, under the Constitution, be given women, the legislature has power to say that they may vote at all city, town or school elections. It follows that the simple words, "Women may vote at all city, town and school elections, but not on the selection of officers", would be authority to vote at such elections "for the purpose of borrowing money" or "on the question of issuing any bonds for municipal or school purposes" or "on the question of increasing the tax levy", or—what the court has written into Section 1131—"on any proposition if it is debatable whether carrying it out will cost more than is received, and it is therefore possible there will be an increased tax levy". It follows, in turn, that, if it was the intent to permit voting upon all propositions that *might* cause additional burdens, it was idle to write these three specific permissions.

It is perhaps doubtful whether, with the selection of officers eliminated, more could ever arise to be voted on at city, town or school elections than proposals which might necessitate borrowing, issuing bonds, increasing tax levies, or in some way create a possibility of burdening the taxpayer. But if

more could arise to be voted on, this simple supposed statute would authorize voting on that as well as on said stated proposals. If it was the intention to make the right to vote thus plenary, why was not that said in the supposed statute of few unmistakable words, instead of trying to give power to vote on all things by merely specifying part of the things that can arise to be voted on? See *Hall v. City*, (Wis.) 107 N. W., at 33, right column; *Holmes & Bull Furniture Co. v. Hedges*, (Wash.) 43 Pac. 944.

It was worse than merely idle to express such an intention, without any general words of grant, and with nothing but distinct enumerations. Some as captious as the writer might misunderstand this, and think that specific grants alone were given. In other words, on the reasoning of the majority, the intention to give the power to vote upon all questions was so expressed as to make it reasonably possible that the power to vote upon some things would be denied, because not included in the enumeration. In still other words, the legislature expressed a desire that women should vote on all propositions that might add to their burden as taxpayers, by distinctly conferring nothing but the right to vote upon what is less than all such propositions. For example, enterprises that require neither the borrowing of money, the issuing of bonds nor the increase of the tax levy, might yet operate to add to the burden of the taxpayer.

Proceeding without regard to the argument of the majority that it is immaterial whether the municipal court will ever be established, and assuming that it will be, and waiving the failure to show that there will be a deficit if the court be established, but starting with the proposition that, unlike the case of building a schoolhouse or the undertaking of some other civic betterments, there will be an income as well as an outlay, keeping in mind that fees will be received, against what may be expended in maintaining the court, and assuming that the fees received will be those heretofore received by the courts

and officers that are superseded, and considering the possibility that the jurisdiction of the municipal court is or may be made larger than any of these, and, therefore, that there may be fees other and additional to such as were receivable by the superseded courts and officers; and it may transpire that the predicate for permitting women to vote will be found to be absent, because there may prove to be a surplus in the treasury, after women have been permitted to vote upon the establishment because, and only because, it was tantamount to increasing the tax levy. It must be as permissible to speculate reasonably upon the mere relative size of an income, when it is certain that there will be one, as to guess that the outgo will be smaller than the income, and to pile upon that guess the guess that an increased tax levy will be necessitated by the guessed deficit. And it will be presented, later, how needless all this straining is.

4. All laws must still be of general operation. That, of course, does not mean that a law is invalid because in its very nature it is available in a large city only, but it does mean at least that it must be applicable alike to all cities of substantially the same size.

Under the construction of the majority, if conditions at Dubuque are such as that it may in reason be claimed that the establishment of such court will not produce an increase in tax levy, the women of Dubuque cannot vote on establishing a municipal court. If in Davenport the general fund is practically exhausted, or what is on hand is not available, then the same law which keeps the women of Dubuque from voting on this proposition permits the women of Davenport to vote on it.

If women may vote on whether a municipal court may be established, because in some way that is equivalent to voting on the increase of a tax levy, it must follow that a vote on the abolition of that court is the equal of a vote to decrease the tax levy. So, then, women may vote on whether a munici-

pal court shall be established, and may not vote on whether it shall be abolished after it has been established, no matter how much abolition would decrease her tax burden.

If the fact that expenditures must be made to carry out. the vote establishing this court gives women authority to vote upon the establishment, then the women of Polk County outside of Des Moines were entitled to vote on this proposition. These very expenditures are to be apportioned, half to the city and half to the county in which the city lies. If the.possible expenditure of the half paid by the city gives authority to vote because such possible expenditure is the equivalent of an increase of the tax levy, then the expenditure of the other half is just as much an increase of the tax levy. It may be said that the reasoning of the opinion is inapplicable because neither men nor women outside of Des Moines should vote on whether that city shall have a municipal court; that their only right is to help pay for it. But .may those who believe that the demands of justice, or their conception of what is justice, warrant the judicial repeal or amendment of statutes, consistently take such ground? Is not the main argument of the opinion the more applicable because of this difference? For, if it be so wrong to make the women of Des Moines pay taxes for a municipal court in Des Moines unless they may vote upon whether it shall be established, as to justify the court in enlarging the Code, how much more outrageous it is to make women outside pay for a municipal court that belongs not to them, but to the city, and yet deny them the right to vote on whether they shall thus be burdened.

My argument is, of course, not that the women of Polk County outside of Des Moines should have been permitted to vote on this proposition, but that the fact that upon the reasoning of the majority they should be allowed to, proves that the women of Des Moines should not have been allowed to. Nor that any of the things should be done which erroneous view of the statute makes permissible. I am merely

trying to point out how consistent with itself truth always is, and how one may not depart from the true logic of a situation because where it leads is not pleasing, without being forced into numberless and patent inconsistencies and absurdities.

5. I will assume that the burden is on the dissenter. Therefore, while it militates against the opinion if it argues badly, this burden is not always discharged by demonstrating that fact, since the conclusion may be right, though the reasoning be untenable. In proceeding thus far, too, something has been assumed. It remains to show, if I can, without any such assumption, and affirmatively, that the conclusion is wrong, and that authorities invoked for it do not sustain it.

I agree that statutes, generally, "ought not to be given a too narrow or strict construction . . . but rather a liberal construction in order that the purpose of the legislature may be carried out"; and that, where the intent of a statute is apparent, "the court should indulge in no refined distinctions to defeat the legislative purpose or to minimize its operation or effect", and that "it is manifest that by enacting Section 1131 the legislature intended to give some rights to women or extend their rights". But I venture to assert that Code Section 1131, the statute which grants whatever right to vote that women have, should be interpreted more strictly than many other statute provisions. True, *Coggeshall v. City*, 138 Iowa, at 733, indicates in a general way that Section 1131 should be liberally construed—probably by reason of the provisions of Section 3446. If three things are kept in mind, it will be clear that Section 3446 does not warrant that 1131 be "liberally" construed, and clear that same should, instead, have an interpretation that is strict, or, at the least, one that is strictly natural and unstrained. These three things are: (1) Section 3446 has been uniformly construed to deal with purely remedial statutes; (2) the *Coggeshall* case itself negatives what it says as to liberal construction, because it holds that Section 1131 is in the nature of a statu-

tory exception to the general statute law on its subject, in that the case says "the privilege of voting is limited to males in this state, save on certain questions clearly pointed out in Section 1131''; (3) because *Baker v. Clowser,* 158 Iowa, at 161, holds that Section 3446 only negatives "the rule of the common law that statutes in derogation thereof are to be strictly construed'', and has no reference "to the rule of construction to be applied in determining the extent of a statutory exception to a general statutory provision''; and that, "of course, the exception goes no further than the language used in providing for it will fairly warrant, and it must be presumed that, beyond the scope of exception thus provided for, the general statutory provision shall apply''. As already said, the *Coggeshall* case declares that "the privilege of voting is limited to males in this state, save on certain questions clearly pointed out in Section 1131 of the Code''. If that does not constitute this section an exception to a general line of constitutional and statute provisions, it will be found difficult to find words to create such an exception. The rule is that men alone may vote. The only exceptions are found in Section 1131. The one exception relied on to sustain the right of women to vote on whether a city shall establish a municipal court is that they may vote "on the question of increasing the tax levy''. The exceptions in that statute, including the one just quoted, are each and all pure grants of rights—of rights that do not exist without such grant. As to such, more strictly even than as to writings generally, is the rule enforced that no extraneous matter or reasoning is available for enlargement of the letter, unless the words as written are palpably ambiguous. There is nothing ambiguous about the provision that women may vote "on the question of increasing the tax levy''.

Words certainly no more clear, and found in statutes giving women limited voting rights, have quite frequently been construed to mean just what they say.

Of course, a grant that women might vote at all elec-

tions pertaining to school matters has been held to give them the right to vote on whether bonds in a stated amount should be issued for the erection of a high school building—*Hall v. City*, (Wis.) 107 N. W. 31. *People, etc., ex rel. Tilden v. Welsh*, 70 Ill. App. 641, is that giving them the right " 'to vote at any election held for the purpose of choosing any officer under the general or special school laws of this state' ", does not authorize women to vote on a proposition to establish a township high school, submitted at such an election. In *State ex rel. Scott v. Perry*, (Kan.) 33 Pac. 956, is decided that, though the cities of Kansas are "townships", within the meaning of the Constitution and statutes for the purpose of the election of justices of the peace, yet as such officers, although elected within a city are not strictly city officers, an act giving women the right to vote for "city or school officers" does not confer upon them the right to vote for justices of the peace in the cities of the state.

In Wisconsin, the Constitution is not in the way. Therefore, the construction by its Supreme Court of a statute which allows women to vote on the selection of officers is the construction which that court would give to any grant of vote permitted by the Constitution. In *Brown v. Phillips*, (Wis.) 36 N. W. 242, the act under consideration was entitled "an act relating to the exercise of the right of suffrage by women *upon school matters*", and provided that women might vote at any election "pertaining to school matters".

The charter of the city of Racine provided that " 'the public schools in said city shall be under the supervision and management of the board of education, consisting of one school commissioner from each ward. Such commissioners shall be appointed by the mayor, subject to confirmation by the common council'." All contracts entered into by such board of education, except with teachers, were required by the charter to be countersigned by the city comptroller, who is to keep an account of the liabilities incurred by the board for

each current year and report the same to the city council. A board of county supervisors exercises all legislative functions of the county as a body corporate, and cities are represented in such board of supervisors. A municipal election was held in Racine for the election of mayor, city clerk, comptroller, justice of the peace, assessor, city marshal, and alderman for each ward and a supervisor. The plaintiff, a woman, claimed the right to vote a tendered ballot with the names of all candidates for offices other than said four cancelled out, and demanded to thus vote upon the selection of these four officers because, since they performed some duties, as above shown, relating to school matters, an election at which they were chosen was ''an election pertaining to school matters'', within the meaning of the statute. Plaintiff ''contended that such right extended to the voting for any officer having any duty pertaining to school matters however remotely'', while defendant ''claimed that such right only extends to the voting directly for school officers''. It was held that it is the character of the election itself which determines the right of women to participate in it, and that the mere fact that a city, county or state officer may, as incident to his office, be required to do some act which may, more or less remotely, affect schools, does not make the election of such officer one pertaining to school matters, and this, though the charter required the mayor to nominate, and with the approval of the common council appoint, school commissioners, whose duties pertained to school matters, it being further held that the act of electing or choosing the mayor was in no sense the act of electing or choosing such school commissioners.

In *In re School Committee of Town of Johnston*, (R. I.) 33 Atl. 369, it was claimed that a vote for abolishing a school district was illegal because it was ruled by voters who were by statute disqualified to vote on a proposition imposing a tax or expending money; that the disability was vital because the abolition of the district involved, or might involve, imposing a tax or expending money; and that the vote to abolish ''is

practically a vote to impose a tax, because, under the law, a
tax equal to the amount of the appraisal of the school property
is to follow''. To this the court says that, ''while this is true,
it is, nevertheless, quite different from an ordinary tax''. Pro-
ceeding then to deal with the matter somewhat along the lines
involved in pointing out that the municipal court will have an
income, it is said that ''none of the amount so assessed goes
to the town, but it is all remitted to the taxpayers of the sev-
eral districts, in proportion to the value of the district prop-
erty taken by the town, for the purpose of equalizing the con-
tributions thus made'', and is, therefore, ''a scheme for equali-
zation rather than a tax''. The court then continues that in
the case of *Council of Town of Cranston*, (R. I.) 28 Atl. 608,
it was said that ''it does not follow that a registry voter is
disqualified because the ultimate result of action taken may
affect taxation''; for illustration, because ''dividing a school
district would affect the expense of maintenance, and the area
of taxation''.

It is true the argument is evolved for the purpose of
enlarging franchise, and that, perhaps, a more liberal rule
prevails in that than where an attempt is made at limitation.
But the fact remains that it is a clear holding that voting to
tax or expend money is something different from taking action
which may, by possibility, result in expenditure or taxation.

6. But if these shed no light on how the grant in our
statute should be interpreted, and if aid in construction be
needed, better help than unsound reasoning is available. Before
the Code was revised with the help of the Code Commissioners,
the grant in Section 1131, Code, 1897, was that women might
vote at certain elections ''held *for the purpose* of increasing
the tax levy''. 25th G. A., Ch. 39. It is thoroughly settled
that verbal changes made on the recommendation of the com-
missioners are to be treated as stating equivalents by the use
of words more apt than those used before revision. See
*McDonald v. Anchor. Mut. Ins. Co.*, 116 Iowa 371, 373; *Saun-
ders v. City of Iowa City*, 134 Iowa 132, 140; *Raher v. Raher*,

150 Iowa 511, 518; *Baker v. Clowser,* 158 Iowa, at 160, 161; *Hammond v. Waldron,* 153 Iowa, at 439; *Des Moines City R. Co. v. City of Des Moines,* 152 Iowa, at 21, 22; *Eastwood v. Crane,* 125 Iowa, at 714, 715. We must then treat present Section 1131 as the equivalent of a provision that women may vote at an election held *for the purpose* of increasing the tax levy. The words "for the purpose of" would seem to be beyond the need of construing, even if the words "on the question of increasing the tax levy" are not. Against an assertion that the referendum involved was an election held "for the purpose of increasing the tax levy", no argument is possible. Nothing can be said except to deny the assertion. What more can be said in reply than that an election on whether a munici-- pal court shall be established is not an election called "for the purpose" of increasing the tax levy? One cannot add to a truism by argument, nor by argument strengthen a self-evi-- dent proposition. The speaker of the house of representatives is one who, upon certain contingencies, may become president because he is speaker. What "argument" could be urged against an assertion that the election of speaker was a presidential election? We now have an election called, for one thing, for the purpose of electing senators of the United States. Before the people were authorized to elect a senator, the election was by the general assembly. It was certain that they would elect senators. Was the election of members of the assembly an election "for the purpose of electing a United States Senator"?

Talk about taking into consideration such claims as that the voter understood a tax levy might or would result. What is better understood than that a vote for presidential electors is intended to be a vote for a candidate for president? Who would claim in a court that, therefore, a legally authorized, direct vote for that candidate was cast? Unlike whether an increased tax levy will follow the establishing of a municipal court, that presidential electors will choose for president according to the vote of the people, is very near to certainty.

This is proved by history and guaranteed by implied contract which no such elector is likely to breach. But it will not be disputed that a vote for elector is not a lawful direct vote for president. On the theory of the opinion, while an election to name presidential electors who choose the president and will elect him according to a preference expressed by those who chose them, is not, in law, an "election for the purpose of electing a president", one called to determine whether a municipal court shall be established, is "an election for the purpose of increasing the tax levy". In the one case, it is a certainty that the vote will make a president; in the second, it is at best a guess whether an increased tax levy will follow; but, again on the theory of the opinion, the one is not called for the purpose of electing a president, but the other is called for the purpose of increasing the tax levy.

And how utterly needless all such straining is. What is there unnatural, or injurious to the rights of women, in a construction that they may vote only when the very question submitted is whether the levy shall be increased? It is confessed that they are not entitled to vote on the establishing of this court unless that involves whether the rate of levy is to be enlarged. If the proposal fails, there will be no tax to raise. If it carries, that, *ipso facto*, adds nothing to taxes. That can happen, in no view, unless the court creates a deficit. Why not let the man vote take the chances on whether the court if established will be self-sustaining, and on whether if it needs taxes the vote of both sexes will authorize a levy to raise them? Why proceed on debatable ground when both certainty and 'protection of all rights may be had? Why insist on substituting mere speculation for an actual situation? The statute rights of women may be amply protected by letting them vote whenever the question whether taxes shall be levied for the municipal court actually has arisen. Though not permitted to vote on the establishment, there is no chance to burden them with taxes for this purpose, without opportunity to vote upon whether these shall be levied, if the levy may not

be made except at an election, at which they are permitted to vote. Why not, therefore, obey the statute? Its very arrangement, framework and clear words all contemplate that they shall not vote on a proposal merely because it is or can be claimed that increased taxes may sometime or in some conditions follow; that they may vote only when the proper authority has determined the tax must be raised and asks them to say whether they agree. It is not even permitted to vote on whether the levy shall be increased. The words of grant are that they may vote ''on the question of increasing'', etc. So far as it is in human power to express intent by words, these provide for voting upon a formulated and submitted proposal to increase the levy, as distinguished from one as to which it may be claimed and denied whether it will ever cause a tax levy, or how large a one. The protection of the voter of either sex demands this construction. On the other hand, a vote for a proposition may result in no tax, a small one or a very large one. He who supports it on assurance that the tax will not be burdensome has no redress. This is especially so of women, because, confessedly, they cannot vote to abolish. But if the authorities give a chance to vote on the *question*, all this is obviated.

As it seems to me, all that can be said against this is that, if all the eggs are put into one basket, it may save the cost of a merely possible second referendum vote; that it is more advisable to take chances on a single election, which is not sanctioned by law, than to have two elections, legal beyond doubt, one of which may never be held.

Let me once more borrow from the dissent of Mr. Justice Marshall in *Hall v. City of Madison*, (Wis.) 107 N. W. 35:

''The question involved here is not one to be viewed very much by the light of sentimental considerations, nor that of public policy. The former may embellish truth, but does not point the way to it. The latter may, in a proper case, make language, otherwise plain, appear to be ambiguous, and justify judicial construction, and aid in that regard, but otherwise

it is a matter solely for legislative consideration. Where words are plain and, taken as they read, lead to no absurd consequences, no consideration of public policy, in the judicial view, can legitimately create ambiguity, giving rise to opportunity and justification for varying the literal sense. Applying the rule to a statute, 'there can be no reason for refusing to admit the meaning which the words naturally present; to go elsewhere in search of conjecture in order to restrict or extend the act, would be but an attempt to elude it. . . . However luminous each clause might be, however clear and precise the terms of it, all this would be of no avail, if it be allowed to go in quest of extraneous arguments, to prove that it is not to be understood in the sense which it naturally presents.' Smith's Statutory & Constitutional Law, § 478.''

II. Some reliance is placed upon *Coggeshall v. Des Moines*, 138 Iowa 730. The majority concludes that:

''In the *Coggeshall* case the question was not whether a tax in any certain amount should be levied, but whether $350,000 should be raised by the levy of a tax, or the sale of bonds. The discussion in that case is that it is not necessary to specify the precise amount of bonds or tax.''

That this is singled out, is fair evidence that it is because of this situation it is thought the *Coggeshall* case, while ''it may not be directly in point'' has reasoning that ''has a bearing in the instant case''. Frankness compels the statement that if all that is *said* in the *Coggeshall* case is *decision*, there is more in that case which has such bearing than is indicated by what the opinion claims for that case. But before entering upon what use the *Coggeshall* case is here, I feel it my duty to say that no member of the court who was of the majority in *Hubbell v. Des Moines*, 173 Iowa 55, should now concur in the statement of the present opinion, to wit:

''The *Coggeshall* case may not be directly in point, and there may be some discussion in that case not necessary to meet the point there decided, yet the reasoning there has a bearing in the instant case.''

In said dissent in *Hall v. City,* it is said that on some theories of what constitutes *obiter,* "a decision as a judicial rule goes really no further than the mandate: the decision of the ultimate question in the case, or questions essential to the final result. If that were correct, the major part of every legal opinion would be *obiter.* There would be very little use for writing legal opinions and preserving them as precedents. All that would be useful would be a statement of the facts and the decision." I had not seen this when I wrote my dissent in *Hubbell's* case, but voiced its thought by asserting that a decision which gives damages because that was done which constitutes a taking of private property for public use does not merely decide that damages were due, but as much, that the act for which the damages are allowed constitutes such taking of property. The inspiration for this protest was the conviction that, if a decision that damages were due because private property had been taken for public use could not safely be assumed to decide that the acts for which these damages were allowed constituted such taking, our decisions afforded the bar and the public no guide on what the law is. It remains for me to add that the uncertainty thus created is aggravated beyond all bearing, when the same court that so rules in one case, in the very next dismisses all limitations upon *obiter,* and gives to mere casual language, which has no question involved to rest on, the effect of the laws of the Medes and Persians. I may be unduly aggressive on this. If so, that is perhaps explained by my having so very recently left the ranks of those who suffer from these practices, while my colleagues have been so long away from the bar and its troubles as that, like the dentist who advertised that he extracted teeth without pain, and who explained to a sufferer that he meant without pain to himself, they have forgotten that the patients of this court suffer if, whenever we find it hard to reach a conclusion which is desirable, we thus indulge in playing fast and loose with what is still politely termed *stare decisis.*

2.

What that is relevant here does the *Coggeshall* case *decide?* To answer, there must be considered: (1) What referendum vote is the subject of inquiry? (2) What statute is being construed? That being ascertained, if the referendum and statute there in review do not substantially differ from those involved here, the case controls the present appeal. As to what is *obiter,* the test is quite as simple and sure. Whatever is said that is reasonably relevant argument on the question of whether the statute involved in the *Coggeshall* case authorizes women to vote on the referendum involved in that case is not *obiter;* all else is.

In the *Coggeshall* case, the question submitted was: "Shall the city of Des Moines erect a city hall at a cost not exceeding $350,000?" 138 Iowa 731. And Chapter 34, 32 G. A., expressly provides that for the purpose of paying for the construction of such building and the purchase price of the ground, the city shall have power to levy a stated additional tax (in the enactment of which, the legislature evidently forgot the rule of the majority that authorizing a vote upon whether a building shall be erected of itself authorizes the levy of additional taxes and the issuance of bonds). Now, it being certain and definite and upon the ballot that the question was whether the city should erect a hall at a cost not exceeding $350,000, and said Chapter 34 being in effect, it was truly quite immaterial to say:

"It is immaterial whether the question specify the precise amount of bonds to be issued or tax levied or authorize the construction of an improvement involving the raising of money in one or both of these methods with which to pay the cost."

The statute considered in the *Coggeshall* case was not Section 1131, but that section plus Chapter 34, 32 G. A., and the case well adds:

"These different sections are interdependent, and were enacted with a view to the accomplishment of a single object,

and none of the accepted canons of construction lend support to the contention of appellees that each of the first three should be held to confer separate powers, each independent of the other; only the first being limited by the fourth. We are of the opinion that they should be construed together, and that an affirmative vote by a majority of those voting is essential as a condition precedent to the levying of the special tax or issuance of bonds for the payment of the building.''

Voters, in common with all persons, must be held to act in recognition of existing law. Therefore, at the referendum vote to build the city hall in Des Moines, the one involved in the *Coggeshall* case, the ballot had upon its face all that was printed thereon and the provisions of said act of the general assembly, and the question submitted was, therefore:

"Shall the city of Des Moines erect a city hall at a cost not exceeding $350,000, and at its pleasure levy upon all the property within the corporate limits of the city subject to taxation for said purposes, additional to all other taxes now provided by law, a special tax of not exceeding in any one year two mills on the dollar for a period of years not exceeding twenty, and in anticipation of the special tax so authorized issue bonds and sell the same, said bonds to become due at different periods, but none of them to be due and payable in less than five or more than twenty years from date?''

To hold that voting on such a proposition is voting on the borrowing of money for municipal purposes, or issuing bonds therefor, or increasing the tax levy, is manifestly right. Therefore, the *Coggeshall* case rightly reached the conclusion that women should have been permitted to vote on the question of the erection of said city hall. The vital difference is that no such provision as is found in Chapter 34, 32 G. A., and no provision authorizing a special or additional tax, or any tax, or the issuing of any bonds, in aid of the establishment of a municipal court, exist.

In the present case, the question was submitted whether there should be an establishment under the provisions of Sec-

tion 694, etc., of the Supplemental Supplement to the Code of Iowa, 1915. There would be a perfect parallel between this and the *Coggeshall* case, if the section referred to on the municipal court ballot had contained provisions authorizing borrowing money or issuing or selling bonds.

It was quite needless to say (138 Iowa 733) that ''statutes in this state are to be liberally construed, to the end that the object had in their enactment be effectuated''. The conclusion reached was warranted on the strictest construction of the statute. It was perfectly warranted to say that ''this was a city election, and . . . the vote was both on the question of issuing bonds and on the question of increasing the tax levy'' (138 Iowa 732). All this is manifestly true of the proposition upon which the vote at said city election was had. It is warranted to say that (138 Iowa 736) ''the question submitted involved that of issuing bonds and increasing taxation'', but not warranted to say further, in apparent forgetfulness of what was emphasized before,—to wit: the factor cut by Chapter 34 of the Acts of the 32d General Assembly;— that all this is so because of the provision of Section 1131. The opinion had made it too clear for argument, in doing the deciding part of the opinion, that the conclusion was not reached ''under the plain provisions of Section 1131'', but upon that provision treated together with said provision of the general assembly.

All further said in the *Coggeshall* opinion along these lines is: ''The consequence of the election is the same in either event. What practical difference is there between voting a tax to be levied at so many mills a year until $350,000 is raised, or the issuance of that amount in bonds, the proceeds to be paid for the cost of a building, and voting for the erection of a building at that cost, thereby authorizing the expenditure of that amount to be raised by the city in one or both these methods? In either event, the question of the issuance of bonds or increase of taxation is directly involved, and on that the voice of the women can no longer be silenced in this state, save

by the repeal of this statute. . . . It is enough that the question submitted involved the granting of power to the council of the city of Des Moines to make a special tax levy or to issue bonds, and that is the only matter ever determined by the voters of an election called to pass on such a question. . . . The vote of the people never operates as a levy nor the execution of bonds. It merely empowers the proper officers to do these things, and this may be accomplished by a direct expression on the issuance of bonds or increase of taxation, or indirectly by instructing the officers to make improvements or erect buildings which necessarily have this effect." (138 Iowa 732, 733.)

Some of this is quite unnecessary to the decision. But all of it is true as applied to the record in that case. Enough has been said to make plain why I think it effects nothing in this case.

## DIVISION II.

My brothers of the majority have laboriously, thoroughly and successfully demonstrated that the honest result of an "election" should not be nullified, and those legally participating therein disfranchised, because election officers have indulged in nonprejudicial departures from purely modal, and therefore directory, requirements. This is an undenied and undeniable premise for any conclusion that may properly be drawn therefrom. But that a premise is sound is no proof that a deduction therefrom is warranted. It is regrettable that so much strength was expended in founding said premise, and nothing advanced to fortify the deduction. No energy need have been expended to support the position that such departures will not be permitted to have such effect. It is regrettable that none was expended to prove that an entire failure to provide booths for the use of the electors is such immaterial departure; nor upon whether the possibility of "disfranchisement" is involved in a referendum vote which the majority concedes is not within the meaning of the word

"elections" as used in constitutions and statutes, because "elections" thus used means elections of officers only.

It will be found that said general rule has been mainly applied in what are not, in law, elections (see the *Coggeshall* case, 138 Iowa 739), and that, if applied in contests that are not, in strictness, elections, the rule against disfranchisement was announced without any consideration of whether its applicability was not lost because the contest passed upon was not what is in strictness an election.

Unlike an election in strictness, the setting aside of referendum votes like unto the one here in consideration does not disfranchise. Another referendum can be called and all entitled vote thereat. Most of the general rule rests upon the fact that if a general election, say for officers, be declared illegal, the elector cannot express his choice on officers, again, say, for two years. And it may result that for these years men hold over whom the voter wishes to retire, or, as in the case of judges, that a vacancy thus occurs, and appointment takes the place of popular election.

### 2.

Of the cases relied on by the majority, the following do no more than deal with what are or should be confessedly mere nonprejudicial irregularities and departure in detail; and none of them involve the absence of booths or any irregularity concerning booths. *Dishon v. Smith, County Judge,* 10 Iowa 212; *Kinney v. Howard,* 133 Iowa 94; *Short v. Gouger,* (Tex.) 130 S. W. 267; *State ex rel. Walklin v. Shanks,* (S. D.) 125 N. W. 122; *McGrane v. County of Nez Perce,* (Idaho) 112 Pac. 312; *Murphy v. City of Spokane,* (Wash.) 117 Pac. 476; *Lehigh Tile Co. v. Inc. Town of Lehigh,* 156 Iowa 386. How much value there is in *State ex rel. Smith v. Burbridge* (Fla.), 3 So., this statement, found at page 877, should settle. It is:

"Not only is it a fact that no law has been violated, nor any regulation of law departed from, in the appointment of the polling places in the several wards, but it is also satisfac-

torily shown by the record that proper measures were taken to inform the public as to the same.''

In *Moyer v. Van de Vanter,* (Wash.) 41 Pac., at 61, it is said that ''Legislation going to promote the honesty of elec-tions is most beneficial in character, and as a means of secur-ing this end the general policy of the law is that the ballot shall be a secret one, that it may not be known for which can-didate any particular voter voted, in order that bribery may be prevented.'' Literally, all that is said as to booths is this: ''The fact that the election officers failed to have booths erected which complied with the law . . . was also but an irregularity which would not vitiate the election.'' (Page 62 of 41 Pac., right column.)

In *Altgelt v. Callaghan,* (Tex.) 144 S. W. 1166, one hold-ing is that the failure of the election officers ''to require voters to prepare their ballots in a voting booth, as required by law'', does not invalidate the votes of those not using the booths. It is said (1169, right column):

''Certain means are prescribed by law as the most certain to bring about the desired result. Some of these, from their very nature, or from the manner in which they are prescribed, are deemed absolutely essential to the accomplishment of the desired result. Among these may be named the requirement that the voting shall be by ballot.'' And that this and others ''are prescribed to insure perfect freedom of choice to the citizen''. Further, that ''The provision of the law in regard to voting booths is for the purpose of obtaining secrecy of ballot, and is peculiarly for the benefit of the voter, and, while the law in regard to voters' preparing their ballots in the booth should be enforced, the failure to do so would not invalidate the votes of those not using the booths.''

All of which makes it apparent that the booths were fur-nished and that the decision, as distinguished from mere lan-guage, is that the failure of the election officers to require the voters to use the booth is not enough to invalidate a regular election.

*Perry v. Hackney,* (N. D.) 90 N. W. 483, involves a question connected with booths, and the majority is right in citing the case for the proposition that what occurred in that case did not go beyond the violation of a directory statute. But it will be found that it is decided, and this appears in the syllabus prepared by the court, that the ballots "were marked by the electors in secret". So, of course, the means of voting in secret could not have been absent. The point decided is that a precinct will not be thrown out because of failure of the officers "to comply strictly with the statute prescribing the *manner of preparing* booths and *guard rails,* inasmuch as such irregularities did not defeat the purpose of the requirement".

*Cook v. State,* (Tenn.) 16 S. W. 471, involves no booths and passes upon nothing more than whether the Australian ballot law is violative of constitutional provisions against educational tests, and the like. *Peabody v. Burch,* (Kan.) 89 Pac. 1016, involves failure to put official endorsement on the ballot, and the placing a party ticket thereon where the party had fallen so low in numbers as not to be entitled to such recognition.

In the last analysis, the opinion relies upon such unquestioned generalities as: "It is the duty of the court to sustain an election authorized by law if it has been so conducted as to give a free and fair expression of the popular will and the actual result thereof is clearly ascertained"; and upon texts that: "Where an election appears to have been fairly and honestly conducted, it will not be invalidated by mere irregularities which are not shown to have affected the result, for in the absence of fraud the courts are disposed to give effect to elections, when possible. And it has even been held that gross irregularities not amounting to fraud do not vitiate an election." 15 Cyc., pp. 372, 373.

It will be found that in support of these very texts are cases like *Melvin's,* 68 Pa. 333, 339, which holds that it is well settled "that a whole election district may be stricken out, on showing an entire disregard of conformity to law in

holding it, either by design or ignorance". The main flaw was not holding the election at the place designated by law, for which the voters were not to blame. It is said of this that the court below erred because it seemed "entirely to ignore, as of no consequence, a compliance with the law fixing the places for holding the election in these districts by acts of the legislature and court" (337 and 338 of 68 Pa.). "A fixed place, it seems to me, is as absolutely a requisite according to the election laws as is the time of voting. The holding of elections at the places fixed by law is not directory; it is mandatory, and cannot be omitted without error. I will not say that in case of the destruction of a designated building on the eve of an election, the election might not be held on the same or contiguous ground as a matter of necessity. . . . But then the necessity must be absolute; discarding all mere ideas of convenience. It is, however, not necessary to adjudicate authoritatively as to this." ·

Later, I shall attempt to show that holding this election in the wrong place is not more vital than denying the opportunity for voting in secret.

In another· case cited for said text (*Van Amringe v. Taylor*, 12 S. E. 1005, 1006), a case involving the assumption to act as registrar by one who was not a *de facto* officer, the Supreme Court of North Carolina held that:

"An essential element of a valid election is that it shall be held by lawful authority, substantially as prescribed by law. It is not sufficient that it be simply conducted honestly; it must as well have legal sanction, the statutory provisions and regulations in respect to public elections in this state must be observed and prevail, certainly in their substance. Otherwise, the election will be void, and so treated. Therefore, the contention that if the election in question was simply conducted fairly and honestly it was valid, is unfounded."

Said cited text also says: "Since the first consideration of the state is to give effect to the expressed will of the majority, it is directly interested in having each voter cast a

ballot in accordance with the dictates of his individual judg-
ment. . . . Courts have uniformly held that when the
statute expressly or by fair implication declares any act to
be essential to a valid election, or that an act shall be per-
formed in a given manner, and in no other, such provisions
are mandatory and exclusive.'' 15 Cyc. 317.

*Young v. Simpson,* (Colo.) 42 Pac. 666, and *Dickinson v.
Freed,* in the same court, 55 Pac. 812, 814, involve no viola-
tion of secrecy, nor any question about booths, but in recog-
nizing the general rule say:

''The principal object of the rules of procedure pre-
scribed by statute for conducting an election is to protect the
voter in his constitutional right to vote in secret; to prevent
fraud in balloting, and to secure a fair count.''

It is conceded that no voting booths were furnished or
used in this election, and stipulated that the city was without
booths for use thereat; that the city clerk was not furnished
with them to be used for the several precincts of the city.
The opinion correctly states that appellants contend it was
incumbent upon the mayor and clerk to provide the necessary
supplies and equipment for the holding of elections, includ-
ing the booths for screening the voter while marking his
ballot, and to provide for secrecy in such marking so that
there can be no interference or influence upon a voter while
exercising the right of suffrage. It says, further, that the
allegation and claim of plaintiff with respect to the interfer-
ence by judges of election is based upon the fact that in at least
one instance one of the judges, without request from a voter,
opened the ballot containing the proposition and stated to the
prospective voter: ''If you are opposed to the present system
of justices of the peace and police court, which you are, you
will vote 'yes' '', indicating on the ballot where he should mark
the same.

Whether it may rightly be said that this contention of
appellant is untenable, and the matter complained of, of no

consequence, would seem to depend rather upon what is a reasonable construction of the statute on the subject, and proper consideration of the objects of the statute, and of whether requirements effectuating secrecy are mandatory, than upon proving that nonprejudicial departures will not disfranchise voters.

3.

It is more than fair to the majority to say that the consideration of the cases and texts thus far commented upon and which, as I understand it, do not go outside of what is cited and relied upon by the majority themselves, indicate that the so-called Australian ballot system does attach some weight to secrecy; that they indicate, quite strongly, that, as distinguished from nonobservance of details, a complete failure to obey some substantial provision will not be tolerated; and that, while they do not say that such a disregard of statute as is utter failure to provide booths violates the substance of the statute, the impression is conveyed that it is such a violation.

It should be conceded that the legislature could make any provision of the election statute mandatory; that it can do this only by words which, reasonably construed, indicate such purpose, and that any provision involving the secrecy of the ballot is, in such sense, presumed to be vital as that words less positive will, when dealing with that subject, be dealt with as mandatory more readily than if used in a provision, say, that the ballots voted shall be initialed by the election officers. I admit that though the letter of a statute designed to obtain secrecy be departed from, and secrecy is still in substance made obtainable, such departure is merely one from detail. What I am speaking of is a confessed disobedience of statute which makes impossible to vote in secret—not of a defective booth; not one placed in the room at a place other than prescribed by statute; not one whose writing shelf is not of the required height; but of the total absence of booths.

Section 1113, Code, 1897, provides that conveniences and supplies shall be provided which shall include "a sufficient number or supply of booths . . . to enable the voter to prepare his ballot for voting, screened from all observation as to the manner in which he does so." Not content with this, other provisions are made so that others than voters cannot get nearer to the booth than within six feet; still others, that the booths shall be reachable only by a guard rail erected to keep persons from approaching to within six feet of the booths. Still not content, there is a provision that the booths shall be in plain view of the election officers, and also of persons outside of the guard rail. Each side of the booth is to be seven feet high, the door or curtain thereof shall extend within two feet of the floor, and shall be closed while the voter is preparing his ballot.

As said, I am not claiming that if the booth were six feet high instead of seven, or if the curtain extended to within a foot of the floor instead of two feet, or, for that matter, did not reach the floor by two feet and a half, this would vitiate the vote. What I do claim is that these details, added to the provisions of substance, indicate in the plainest possible words that the intention was to require that to be done which would make it practically impossible to know how the voter voted. And I contend that an election at which all who come must vote in one room, open to the observation of all others voting and of all bystanders and of the officers, where voting is done under conditions by which an election officer sees the ballot, argues with the voter on how to vote, and points out the place on the ballot where thus to vote, does not provide means for secret voting.

Just how could the legislature have more effectively declared that the failure to have booths at all was considered a vital defect or, rather, that the supplying of booths was considered matter of substance, unless it had indulged in the absolutely unusual, if not unheard of, course of adding to the statute, "and the provisions hereof shall be mandatory"?

While, as is usual in using case law, it is found that some things happened in *Banks v. Sergent*, (Ky.) 48 S. W. 149, and in *Clark v. Robinson*, decided by the Supreme Court of that state, in 166 S. W. 801, 803, 804, in addition to the denial of the right to vote in secret, I think it beyond reasonable dispute that these cases hold expressly that a precinct should be cast out where the secrecy of the ballot was denied. In *Conaty v. Gardner*, (Conn.) 52 Atl. 418, and *Hayes v. Kirkwood*, (Cal.) 69 Pac. 30, elections are sustained though there were departures from required details with reference to the placing of and the entrance into and passing from the booth. None the less these two indicate that a departure consisting of having no booths at all, and no arrangement for secret voting, would not be thus tenderly dealt with.

### 4.

Now, to be sure, there is no proof, and usually there cannot be, that the vote was influenced by the publicity of the voting. Within the reasoning of the *Coggeshall* case, 138 Iowa, at 742, 743, such injurious consequences must be presumed. Any other rule would defeat such statute, no matter how mandatorily worded. It should be presumed that the legislature presumed that freedom of the ballot would depart the moment the screen from observation was taken away.

### DIVISION III.

The majority says: ''It must be admitted from this record that there was not a strict observance of the registration laws by the registration officers. But it is clear that such officers attempted to provide a means for ascertaining the citizen who shall be entitled to vote, and this is the purpose of the registration laws.''

Right here lies my point. I think the record demonstrates that this basic purpose was defeated. The object of the statute is to make easy and sure the checking up of the right

of persons to vote, by providing, in substance, the carrying forward additions and subtractions to some one single specified book. The record, and, I regret to add, the opinion, have not enabled me to be as clear on this as I could wish; but it seems to me that there was no single and prescribed book, a consultation of which would enable the taking of steps to prevent fraud and, where that failed, to have it punished.

*People ex rel. Johnson v. Earl,* (Colo.) 94 Pac. 294, gets us nowhere. It once more is an affirmance that immaterial departures from registration statutes, like all other immaterial departures in other election statutes, are not fatal. That leaves entirely open whether what was done here is or is not more than a mere disobedience of the registration statute in some immaterial respect.

From the concession that without registration this referendum would be illegal, it would seem to follow that statements such as that the voter is not to blame for failure to obey registration statutes, and should not be obliged to take along a lawyer to ascertain whether the registry lists are legal, are not highly persuasive. For he would be just as little to blame if there had been no registration; in which case it is, as said, conceded that the election would be illegal.

It is true that for the manner that the registration lists here were provided, the voters were not to blame. It still remains the fact that the purpose of registration and of preparing lists of those who are registered involves other considerations than the hardship of affecting the voter with acts for which he is not to blame. As said, the ultimate purpose behind such statutes is to make it easy and sure to ascertain whether someone tendering a ballot is entitled to cast it. If the election officers had made no registry list, the voter would not be to blame. But it would still be true that without such list the means of anticipating, preventing and punishing fraud, and the deterrent effect of the presence of a proper registry list, would be lost. We seem here to be compelled to choose between on the one hand depriving a voter, who may have a

second chance at a second referendum, of the right to vote at the first, and sustaining methods which are calculated to lead to fraud and corruption, even though the proof be not available that departure from the law has, in a particular instance, resulted in fraud and corruption.

Too much stress is laid upon the doctrine that no departure from the provisions of election statutes will nullify the election unless it is claimed and—as it would be useless to claim it without proving it—proved that there was some effective fraud or corruption on the part of the election officers. Sufficient has been already said, and express words in cases relied on by the majority in other connections hold, that, if the purpose and vitals of the statute are disregarded, it is unnecessary to go into what is often the impossible burden of proving that fraud and corruption were practiced. It seems that it should not be required to prove that a gun was fired, pointed in the direction of a man; that the man fell down and was found with a bullet in him; and, in addition, that some eyewitness should say he saw the bullet hit the man.

Since the opinion admits that there was not a strict observance of the registration laws by the registration officers, I am unable to see upon what is rested the deduction that no prejudice was suffered, nor to understand the force given the failure to prove prejudice. I think prejudice should be presumed. It is not unreasonable to ask that, when substantial purposes of a statute are disregarded, the burden of showing that no harm resulted should be upon those who in such respects violated the law.

In the *Coggeshall* case, there were only two women who tendered a ballot. On the face of it, their being rejected was immaterial, because if they had voted, it could not have affected the result. But the court, speaking through Mr. Justice Ladd, demonstrates that, where it is publicly announced that the votes of women will not be received, though tendered, and there is reason to believe that this denial was known to and had consideration from a number of women large enough

to affect the result of the election, the election will be set aside. To me, it seems not one whit more strained to presume that voters compelled to vote in the open were unduly influenced by what might happen to them if their vote became known, than to presume that women who did not actually offer to vote would have done so in sufficient numbers to change the result, if they had not acted under the belief that the election officers would not receive their votes. Both presumptions rest on putting the onus on want of prejudice upon the side by whom or for whom law is disobeyed. The one I would invoke here rests also upon the rule that he who best may know as to whether something was done or not done has the burden. I would reverse.